**FILTSCH et al. v. McJUNKINS et al.**

No. 16732—Opinion Filed Oct. 5, 1926.

Rehearing Denied Jan. 25, 1927.

**1. Deeds—Mortgages—Invalidity for Fraud —Findings Sustained.**

The findings of the court below are not against the weight of the evidence.

**2. Fraudulent Conveyances—Royalty Deed to Wife—Notice of Fraud.**

Where one who has secured a deed to real property through fraud conveys the royalty interest to his wife, who had knowledge of the fraud, such conveyance is void.

**3. Mortgages—Mortgagee as Bona Fide Purchaser—Burden of Proof.**

Where one executes a mortgage on land, title to which was secured through fraud, the burden is upon the mortgagee, as against the true owner, to prove that the mortgage was given for a valuable consideration.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Okmulgee County; Charles C. Smith, Assigned Judge.

Action by Mary Burl McJunkins against Fannie B. Filtsch, Darwin Filtsch, Farmers National Bank of Chandler, and others. Judgment for plaintiff, and defendants Darwin Filtsch, Fannie B. Filtsch, and Farmers National Bank of Chandler appeal. Affirmed.

Jos. I. Pitchford, for plaintiffs in error.

Fedler & Moak, for defendant in error Mary Burl McJunkins.

Chas. R. Freeman, for defendant in error Maud B. Caswell.

Opinion by RAY, C. Immediately after 12 o'clock, midnight, March 24, 1924, being the exact time at which Mary Burl McJunkins,

of Creek and African descent, was supposed to reach her majority, or, as she expressed it, "got grown," she conveyed 80 acres of land in Okmulgee county to Darwin Filtsch. Concluding that she probably had not reached her majority at that time, Filtsch induced her to execute another deed on April 2, 1924. Two days later, April 4th, he deeded a one-half of the royalty interest to his wife, Fannie B. Filtsch, and on April 10th gave a mortgage on the land to Farmers National Bank of Chandler to secure a promissory note of $2,000. Each of these instruments was duly recorded. At the suit of Mary Burl McJunkins, a decree was entered canceling the deed to Filtsch upon the ground that it was secured by fraud and for a grossly inadequate consideration, also canceling the royalty deed from Filtsch to his wife and the mortgage from Filtsch to Farmers National Bank, and quieting her title as against these parties and all persons claiming under or through them. There were a number of other parties to the action claiming an interest under contracts, warranty deeds, tax deeds, and resale tax deeds, who are not interested in this appeal and will not be further referred to.

Maud B. Caswell was decreed to have a lien upon the land by virtue of a mortgage given by the plaintiff. The defendants above mentioned, plaintiffs in error, contend that the mortgage lien of Maud B. Caswell is void, but as we think they have no valid interest in or to the land and the judgment must be affirmed as to them, it is not necessary to consider that question.

The undisputed evidence is that Mary Burl McJunkins owned 160 acres of inherited land in Okmulgee county. She conveyed an undivided one-half interest to B. H. Tabor, and later executed a mortgage on the entire 160 acres for $1,000 to Maud B. Caswell. In January, 1924, with the view of setting aside this deed and mortgage, also with the view of selling the land, she consulted with a firm of attorneys. The following day the defendant Darwin Filtsch, at the suggestion of the attorneys, went to the home of Maudie Martin in Muskogee, where the plaintiff, Mary Burl McJunkins, was staying, at which time some negotiations were had with reference to the land. About March 1st, Mr. Filtsch, in company with his wife, took the plaintiff, Mary Burl McJunkins, and Maudie Martin in his car to Rentiesville, where he left them and where they remained for about two weeks. March 18th Filtsch was again in Rentiesville, and had a conversation with the plaintiff and Maudie Martin. On the same day, March 18th, one

Turner and Clarence McJunkins, husband of the plaintiff, went to Rentiesville to get plaintiff and take her to Okmulgee for the purpose of making a sale of the land to certain parties in Okmulgee. Plaintiff did not go with her husband and Turner to Okmulgee, but an understanding was reached with them by which plaintiff and Maudie Martin were to return to Muskogee by train to be met by them at the station in Muskogee. Filtsch rode in the car with Turner and plaintiff's husband to Muskogee and to Filtsch's residence. Filtsch paid Turner $3 for his transportation.

Instead of going by train from Rentiesville to Muskogee, plaintiff and Maudie Martin went in an automobile, driven by one Roman, to the residence of Filtsch, where they arrived some time after dark. After staying there a few minutes they were driven to the home of Bertha Keaton in the city of Muskogee, where they stayed for two or three days, when a controversy arose between Maudie Martin and the defendant Filtsch. Filtsch then drove Maudie Martin in his car back to her home, and the plaintiff continued to stay at Bertha Keaton's place until after the deeds in controversy were executed by her to Filtsch. one the 24th day of March and the other the 2nd of April.

The testimony introduced for the plaintiff was that Filtsch agreed to buy 80 acres of the land for $1,600 or $1,500. Plaintiff testified that he agreed to pay $1,600 and Maudie Martin testified that he agreed to pay $1,500 or $1,600. They also testified that he agreed to take care of plaintiff and her husband, who was out of work, until she became of age, at which time the deed was to be executed for $800 cash, balance to be paid later. Plaintiff testified that he paid her $3 per week for her room and $3 for her board for some two or three weeks and then paid her $5 per week for about five weeks, some of the money being paid after the deeds were executed; that he advanced her other monies, bought her clothes, paid grocery bills and other bills, amounting to $147.60.

Maudie Martin testified that Filtsch agreed to pay her $50 for her aid and assistance in securing the deed, but that he did not pay it. Her testimony was that he came to Bertha Keaton's place, where she and plaintiff were staying and charged her, Maudie Martin, with trying to "double-cross" him; that she then said that she and plaintiff would leave, but Filtsch told her to leave but that plaintiff could not leave. She then demanded a dress of hers which the plaintiff at the time had on, and Filtsch told plaintiff to get out of the dress, which she did, and that she, Maudie Martin, then demanded that Filtsch take her back home where he found her and that he did so. Considerable is said about Filtsch's abusive language and that some demonstrations were made by him indicating that he was going to shoot her.

The evidence is conflicting as to when the first deed was executed. The plaintiff testified that it was on Sunday night, March 23rd, but it may be assumed that it was executed at the time testified to by Filtsch and Juanita White, the notary public, who took the acknowledgments. By their testimony it is made to appear that immediately after midnight they went to the home of Bertha Keaton, where plaintiff and her husband were then staying, and into their bedroom, where the deed was executed on the morning of March 24th.

Plaintiff's evidence was that when the deed was executed Filtsch gave her $1, and stated that he would have to go to the bank and get a check cashed to pay the $800, but that the $800 was never paid; that at the time the deed was executed Filtsch presented and had plaintiff to sign a note in the sum of $744, and Filtsch indorsed the note paid and returned it to the plaintiff with the statement, in substance, that there might be a lawsuit and he would need it to show that he had paid for the land.

Maudie Martin testified that on the 18th of March, while she and plaintiff were at Rentiesville, Turner, who was there with plaintiff's husband, wanted the plaintiff to go with them to Okmulgee, and stated that there was a man there who would pay more for the land than Mr. Filtsch had agreed to pay, and that Mr. Filtsch came to them and told them not to go in the car with Turner; that he would send a man to get them and take them to Muskogee. She testified that they then waited until a Mr. Roman, whom plaintiff testified was a taxi driver of Muskogee, called for them in his car and drove them to Muskogee where they arrived about 10 o'clock at night; that he drove them to Mr. Filtsch's residence where they remained a few minutes in the car, and that under Filtsch's direction they were driven to the home of Bertha Keaton where they remained a few days. She also testified that at the time she had the difference with Mr. Filtsch at Bertha Keaton's place she tried to get plaintiff to leave with her but she said she was afraid to go for fear that Mr. Filtsch would shoot her.

Plaintiff's testimony was to the same effect. She testified that she did not meet

her husband at the station on the 18th because Filtsch told her not to meet him; that Clarence, her husband, was trying to "double-cross" him, and he had too much money in the case to lose.

Mr. Filtsch's testimony was, in substance, that he first met plaintiff at Maudie Martin's place, at which time he undertook to clear the title, or at least to investigate it, and agreed to pay her expenses until she became of age, and told in detail the efforts made and work done in looking up the title. He testified that he drove the plaintiff and Maudie Martin to Rentiesville in his car, and that he was again in Rentiesville on the 18th of March, when Turner and plaintiff's husband were there for the purpose of taking her to Okmulgee with view to selling the land. He denied, however, that he made any attempt to prevent her going, with them: denied that he made any arrangement to furnish a car for plaintiff and Maudie Martin to go to Muskogee, and denied that he sent them to Bertha Keaton's place, but admitted paying their expenses while at Bertha Keaton's. He also denied making any threats, or exercising any control or direction over the plaintiff's conduct or movements during the time.

There is a sharp conflict in the evidence as to the amount paid by Mr. Filtsch to the plaintiff. Plaintiff testified as to the amount received from Filtsch and produced an itemized statement. Her testimony was that when the first deed was executed Filtsch paid her $1 and took the deed with him, with the statement that he would have to have a check cashed and would pay her $800, and was to pay the balance in April; that he did not pay the $800; that at the time of the execution of the second deed, on April 2nd, he did not pay her anything but agreed to pay her $300 in addition, which he never paid. The itemized statement furnished by her showed an expenditure of $147.60.

Mr. Filtsch testified that at the time the first deed was executed he paid her $50; that he had an itemized statement of the amount paid out, and checked it over with the plaintiff and, incorporated the amount in the note of $744.60, which he had the plaintiff and her husband to sign. He testified that at the time the second deed was executed he gave her a check for $1 and agreed to pay her $300, and said that he would have to borrow the money. As to the items going to make up the $744.60, claimed by him to have been paid out, his testimony was very unsatisfactory. His testimony was that he had paid the money in cash and not in checks, and that he had paid plaintiff and

her husband items of $25, $50 and $75 at a time, but was unable to say when and in what circumstances he ever made any such payments. He testified that after the execution of the second deed he paid the plaintiff $300 in cash. He made no attempt to say when, where, or in what circumstances he so paid it.

On cross-examination he testified:

"Q. Now Mr. Filtsch, certainly if you paid this sum of $744 for expenses, you can give the court a part of that from memory. Let's see how much you can give, what was the first item, and what was it for? A. They got—they started in a $5 a week. Q. When was that? A. I couldn't tell you, it was in January, I think. Q. Have you got any books? A. No, not now. Q. You don't keep any books of your business? A. No, sir. Q. You paid out this cash and didn't get any receipt? A. Well, they always wanted cash. Q. Can you tell the court where part of this money went—how many $5 did you give? A. Well, I don't know, sometimes they would get $10 and $25 and $50. Q. Well, you kept account of it then? A. Yes, sir. Q. Did you have a book of it? A. Yes, sir. Q. And you threw that book away? A. No, I had it there, and I don't know where in the world it has gone. Q. You threw it away when you made the settlement? A. No, sir. Q. It would take a lot of five dollars, to make $744. A. Yes, sir, and sometimes I gave them $75. Q. Well, when was one time you gave them $75? A. Well, up town, he would come up there and get it. Q. Did you pay it in checks? A. No, sir. Q. Did you give him $75 in bills? A. Yes, sir. Q. Are you in the habit of toting that much money? A. Yes, sir. Q. And taking no receipts? A. No, they told me they would give me this deed. Q. Do you run a bank account with anybody? A. Yes, I have run one, it is small now. Q. How many times did you pay $75 to them in cash? A. I don't know, sometimes they would get $25, or maybe $15 or maybe $50. Q. Well, how many $75's? A. I simply couldn't give you that. Q. You can't give us any idea about what this was for? A. Well, the last time, they bought about $150 worth of clothes. Q. You did let them have that, didn't you? A. Yes, that is part of it. Q. You paid this grocery bill, didn't you? A. Yes, sir, and a number of others Q. Can you make as good a showing of this proposition as this colored girl, and tell us what went with that money? A. I can't tell you any more than that. They got more money from me, they used up the $300 more on April 5th."

Filtsch's testimony that he paid plaintiff $50 at the time the first deed was executed and $1 when the second deed was made is, to some extent, corroborated by the notary public who took the acknowledgments. She testified that when the first deed was exe-

cuted Filtsch gave plaintiff some bills which he at the time said was $50, and when the second deed was made he gave her $1, but was unable to say whether it was a bill or otherwise.

Filtsch's testimony was that the $1 was by check. A check for $1 bearing date April 2nd, signed by Filtsch and indorsed by plaintiff and her husband, was introduced in evidence. On its face was the following indorsement:

"Settlement in full on the S. one-half S E. one-fourth 30-1411, Okmulgee County.

"I hereby accept ——————

     "Mary M. McJunkins, nee Burl,
     "Clarence McJunkins."

Indorsed on back:

     "Mary McJunkins, nee Burl
     "Mary James

"J. M. Reynolds"—and .others including bank indorsements.

Plaintiff admitted the indorsement; but said she received the check from Mary James, who the testimony shows was in the grocery business and had furnished plaintiff groceries which were paid for by Filtsch. She testified that she understood the check was left with Mary James by Filtsch for her. With the exception of two or three checks of $5 each, sent to plaintiff while she was at Rentiesville, the $1 check appears to be the only check claimed by Filtsch or the plaintiff to have been given. When the indorsement on the check, showing it to be payment in full of the land, is considered, together with the established fact that Filtsch agreed at the time the deed was executed, April 2nd, to pay an additional $300 which he says he did pay, and which plaintiff denies, we think it is a circumstance strongly corroborating plaintiff's testimony that it was not delivered when the deed was delivered, but was left at the grocery store at a later date.

The trial court found that the only payments made were those testified to by plaintiff amounting to $147.60; that the deed was secured by fraud and for a grossly inadequate consideration.. We cannot say these findings are against the weight of the evidence. The court observed the witnesses and their demeanor on the witness stand, and their demeanor is, to some extent, reflected by the record. The plaintiff was a negro girl, and the evidence introduced in her behalf tends strongly to show that she and her husband were under the domination of Filtsch, through fear, for sometime before the deeds were executed. That Filtsch was of an aggressive and domineering character

is shown by his answer to a question asked on cross-examination:

"Q. Don't you know that you hired this man from Checotah to carry them up there?

"A. I told you I did not, and I don't want you to deny my word."

As was said by Justice Dunn in Brooks v. Garner, 20 Okla. 236, 94 Pac. 694, 97 Pac. 995, no single fact in the case established fraud, but the evidence, taken as a whole, drives us irresistibly to the conclusion that the deed was secured by fraud.

That $147.60 was a grossly inadequate consideration is shown by the evidence. Plaintiff's evidence was that she was selling the 80 acres for $1,500 or $1,600, while the contention of the defendant Filtsch was that the price of $1,500 or $1,600 was for the entire quarter section, and that he was to get the 80 acres for $750. Assuming the price to be paid to be $750, still $147.60, which the trial court found was all that was paid, must be held to be a grossly inadequate consideration.

The only authority cited, in support of the contention that the court erred in holding that the royalty conveyance from Darwin Filtsch to Fannie B. Filtsch was void, is Swan v. Bailey, 71 Okla. 30, 174 Pac. 1065, where it was held:

"The mere relationship of husband and wife between the parties to a transfer is not sufficient ground for setting aside a conveyance, although the question of the circumstance of such relationship may be considered on the question of fraud. Wimberly v. Winstock et al., 46 Okla. 645, 149 Pac. 238; Potts v. Rubesam, 54 Okla. 408, 156 Pac. 356. Transactions between husband and wife to the prejudice of the husband's creditors will be closely scrutinized to see that they are fair and honest, and not merely contrivances resorted to for the purpose of placing the husband's property beyond the reach of creditors. Where the conveyance is made, even though by an insolvent, for the purpose of discharging an indebtedness incurred in good faith, and the bona fides of the consideration is not attacked, other than by possible inference or a belief that possibly the transaction was colorable, courts will not undertake to defeat the will of such grantor, even though it have the effect of preventing other creditors from subjecting the property in satisfaction of their indebtedness.

"While the question was one of fact, as contended by counsel, it was incumbent upon the trustee to prove that the conveyance was either made without a fair and valuable consideration, or in bad faith, or for the purpose of hindering, delaying, or defrauding the creditors of the grantor. True, it was not necessary that fraud should be established by direct proof; for such purpose, it was

competent to resort to circumstantial or presumptive evidence. But the record contains neither evidence nor inferences of fact sufficient to support a verdict for the plaintiff."

Unquestionably, that is a correct statement of law, but in the instant case Darwin Filtsch acquired his deed by fraud, and there is evidence strongly tending to show that Fannie B. Filtsch had knowledge of that fraud. The testimony of Filtsch was that at the time the second deed was executed by Mary Burl McJunkins, he agreed to pay her an additional $300; that it was his intention at the time to borrow the $300, but after talking to his wife she agreed to pawn her diamond ring for $300 and buy a one-half interest in the royalty; that she did pawn her ring for $300 and paid him that sum for the warranty conveyance. She, Filtsch's wife, also testified that she pawned her ring for $300 and paid that amount to her husband for the royalty deed. That evidence is uncontroverted.

The evidence shows, however, that she went with her husband in the car at the time he drove the plaintiffs and Maudie Martin from Muskogee to Rentiesville, and that plaintiff and Maudie Martin were driven to Filtsch's residence on their return to Muskogee on the night of March 18th; that on Sunday night, March 23rd, the defendant Filtsch brought Juanita White, a young lady notary, public, who resided on the other side of Muskogee from plaintiff's residence, to their residence, where she remained until after midnight, when she, the notary public, and Filtsch went to the home of Bertha Keaton and into the bedroom of plaintiff and her husband and secured the execution and acknowledgment of the deed. Mrs. Filtsch testified that she knew it was after 12 o'clock when her husband and the notary public left for Bertha Keaton's place; that they had had music all the evening.

We think, when the confidential relation existing · between husband and wife is considered, together with the undisputed evidence that she had knowledge of the actions of her husband to the extent above stated, it must be held that the finding of the trial court that she had knowledge of the fraud, necessarily included in the general finding, is not contrary to the evidence.

As to the mortgage of the Farmers National Bank of Chandler, the evidence shows that it was given by Filtsch as additional security for a pre-existing debt. A. E. Patrick, the bank's president, testified that nothing was advanced at the time the mortgage was given, and that he did not remember whether the original note was due; that the

bank called for additional security for the then existing indebtedness, and this mortgage was given as additional security. It cannot be inferred from the evidence that the bank's position was changed to their detriment in any particular by their acceptance of this mortgage as additional security.

The only cases cited in support of the contention that the court erred in holding the mortgage void, are Swan v. Bailey, supra, and Trave-Trammell Co. v. Millard. 108 Okla. 157, 235 Pac. 161. In the latter case it was held:

"A 'bona fide pre-existing debt forms a good and sufficient consideration for a conveyance or transfer of real estate, either in payment of or as security for such debt."

That is unquestionably the law where one in good faith, in consideration of a pre-existing debt, purchases from one who is at the time the owner, but has never been applied so far as we know where the grantor was not at the time the true owner, or had acquired his apparent title through fraud, and was not, therefore, in law or equity the real owner. See Ruth v. Ford, 9 Kan. 17:

"Purchasers of land which has been fraudulently transferred to their grantor must establish the good faith of their purchase and it cannot be presumed." Tucker v. Leonard, 76 Okla. 16, 183 Pac. 907; McIntosh v. Holtgrave, 79 Okla. 63, 191 Pac. 739.

In the well-considered opinion of Adams Oil & Gas Co. v. Hudson, 55 Okla. 386, 155 Pac. 220, it was held:

"To constitute a 'bona fide purchaser' three things must exist: (a) A purchase in good faith; (b) for value; and (c) without notice, And, where a subsequent purchaser interposes the defense of a bona fide purchaser, the burden is upon him to show a purchase for value, and, on his failure to do so, he cannot claim the benefits of a bona fide purchaser."

It having been established that Filtsch acquired his apparent title through fraud. the burden was upon the bank, in order to sustain its mortgage as against the true owner, to prove that it acquired its mortgage for value. This it failed to do.

From a careful consideration of the whole case, we think the findings and conclusions of the trial court are sustained by the evidence, and the judgment is affirmed.

By the Court: It is so ordered.

Note.—See under (1) 9 C. J. p. 1256, §195; 18 C. J. p. 447, §554; 39 Cyc. p. 1785. (2) 39 Cyc. p. 1771. (3) 41 C. J. p. 544, §487.