## NATIONAL BOND & INV. CO, v. CENTRAL NAT. BANK OF ENID,

No. 19163.   Opinion Filed March 4, 1930.

Simons, McKnight, Simons & Smith and W. D. Hereford, for plaintiff in error.

W. H. Hills, for defendant in error.

HALL, C. This is an action by the National Bond & Investment Company against the Central National Bank of Enid, for the conversion of an automobile of the stipulated value of $1,000. The cause was tried to the court without a jury, and judgment was rendered for the defendant. The particular facts in the case are as follows:

One W. M. Worrell, doing business under the trade name of W. M. Worrell Garage at Billings, in Noble county, Okla., sold the automobile in controversy to one H. B. Dunham. The automobile was a new Nash roadster. The plaintiff (plaintiff in error herein) financed the transaction for Dunham, and Dunham executed to W. M. Worrell the usual and regulation note and mortgage on the automobile. This note and mortgage was executed on the 18th day of August, 1925, and it was simultaneously or immediately assigned and transferred to plaintiff, the National Bond & Investment Company. Dunham kept the car a short while and traded it back to W. M. Worrell at Billings. The plaintiff immediately filed its chattel mortgage in the office of the county clerk of Noble county, that being the county in which the automobile was situated and in which Dunham resided. On or about September 22nd, or the following day,

Worrell took the automobile to Enid in Garfield county, and traded it for some second-hand cars. He traded it to a concern styling itself the "Nash-Enid Motor Company". One J. S. Amick was the head of this concern. This particular concern, the Nash-Enid Motor Company, was in financial straits and almost upon the rocks. The defendant. the Central National Bank, held a mortgage on several automobiles owned by this motor company, and on September 26th, about three days after the Nash-Enid Motor Company purchased the automobile involved in this controversy, the said bank, through one of its active officers, a Mr. Stevenson, who was preparing to foreclose on these cars on which the bank held its mortgage, went to the place of business of this motor company, and in checking up the cars found one missing. He objected to the absence of the car, and Mr. Amick very agreeably and in a most accommodating manner told him that the car had been disposed of, but he could substitute therefor an almost brand new Nash roadster which was a much better car than the one covered by the bank's mortgage. The alert Mr. Stevenson immediately accepted, and asked for a bill of sale, which Mr. Amick very cordially executed and delivered to Mr. Stevenson. This bill of sale was for the car originally sold to Dunham and involved here.

The bank, the defendant, later sold the car, and default having been made on the note and mortgage held by plaintiff, it brought this action against the bank for conversion, alleging as damages the amount of its debt as evidenced by its note and mortgage. The value of the automobile alleged to have been converted exceeded the amount of the mortgage lien.

Mr. Stevenson, president of the defendant bank, was called as a witness for defendant, and testified as follows:

"A. Yes, sir; he said he would turn that over in place of the other. We were taking the cars all over that day, anyhow. Q. The fact of the matter is they had blown up and went to pieces financially, weren't they? A. Well, I think they were. Q. Anyway you took—you were taking over the cars covered by your mortgage? A. Yes, sir. Q. And they turned this car over to you to take the place of the one they had sold? A. Yes, sir. Q. And for the purpose of consummating that transaction gave you this bill of sale? A. Yes, sir. Q. And you took this car over then as an additional security on the debt that they owed you? A. Well, I guess that's the way. That is really what it was for. Q. In other words, they owed you and secured you by this mortgage? A. Yes, sir. Q. And sold one of your cars? A. Yes, sir. Q. And turned this over to take the place of the one they sold? A. Yes, sir. Q. You paid nothing then for this car, but you took it in on what they already owed you, You paid them no new consideration for this car, You took it on what they already owed you? A. Yes, sir. Q. And then you sold the car? A. Yes, sir."

Mr. J. S. Amick, the president and treasurer of the Nash-Enid Motor Company, a witness for the defendant, testified, among other things, as follows: Speaking of his knowledge that the car was mortgaged, and that the mortgage was outstanding, he said:

"Q. Did he tell you who owned the paper? A. Yes, he said they had been sold to the National Bond & Investment Company. Q. Now, then, when you repurchased this car from Worrell, what was the terms of that purchase? A. As I remember them now, we gave him something like $1,000 worth of used cars and $500 in money, and we knew at the time there was a mortgage there, but he was to either take up that mortgage himself, or pay us the money and we would take it up. Q. Did Mr. Worrell give you any security of any kind to guarantee his payment of that mortgage to the National Bond & Investment Company? A. He gave us a short time note for $825, which he was either to pay within a very short time or secure. Q. Did he ever pay that note? A. No, sir. * * * Q. What, if anything, did you do relative to advising the National Bond & Investment Company that you had traded for this car, or was about to trade for it? A. In a telephone conversation, while we was playing backward and forward, I told them I was about to trade (for) the car. * * * Q. What, if anything, did they say to you about it? A. I don't think anything was said there at all. I just simply made that remark, I was on a trade or about to trade for the car. Q. Did they say anything about holding the mortgage on the car at that time? A. Well, I don't know that they said anything about it. I knew, and they knew, and they knew that I knew, the National Bond had the paper on the car. Q. Did you later have any further phone conversation with these people about this car, or any correspondence? A. I don't think I had any telephone conversation. I sent them a letter right after the trade was made."

He testified that he did not remember getting a reply to his letter, but his business was confused, and his mail was scattered on account of his business being "shot to pieces", and that he might have gotten a reply. Speaking of his conversation with the person in Oklahoma City, the following testimony was submitted:

"Q. Who did you talk with? A. I couldn't tell you who I talked with, because I don't

know any of those men. Q. It was some one in their office? A. Yes, sir. I believe it was the credit man, but I am not sure. It might have been the assistant manager. Q. In that conversation, the fact was discussed that the National Bond & Investment Company held this chattel mortgage on this car? A. I don't know that it was discussed particularly. It was mentioned. We both knew what car we were talking about. Q. Why did you call them up? A. I think I called them up on some other business. It wasn't anything out of the ordinary for me to talk to them two or three times a week, sometimes a couple of times a day. Q. Well, among other things, you stated to their representative that you were talking with, that your company was taking back this automobile on which they held the chattel mortgage? A. Well, I didn't say that we were taking it back at the time, I gave them to understand that we were about to trade for it. Q. And you understood at that time that they did have the chattel mortgage? A. Yes, sir. At the time I didn't know whether Worrell would pay that off or whether we would have to pay it off. Q. But you knew that somebody would have to? A. Yes, sir."

Another witness called on behalf of defendant was a Mr. E. C. Simmons, who was in the employment of the Nash-Enid Motor Company at the time the transaction in controversy arose. He testified that he picked up the telephone receiver and heard someone speak over the telephone, declaring themselves as the "National Bond", and say, "We told Mr. Worrell to turn that roadster over to Mr. Amick and let him sell it." He further testified as follows:

"Q. Mr. Simmons, are you personally acquainted with any of the office men of the National Bond & Investment at Oklahoma City? A. Never saw one of them in my life. Q. Are you acquainted with Mr. Meyer, sitting behind me, who was the general manager at that time? A. No, sir Q. As a matter of fact, you don't know who you were talking to? A. No, sir. Q. All you know is that you called up, or rather that somebody was on the phone that said they were the National Bond Investment Company. Was it a man or woman? A. Yes, sir, a man. Q. You didn't ask him his name? A. No, sir. Q. He didn't tell you his name? A. No, sir. Q. You don't know who he was? A. No."

The defendant interposed two defenses: First, that the plaintiff had consented to the sale of the property, to wit, the automobile, and by such consent it thereby waived and lost its lien. Second, that, in case such consent was not given to sell the property, the defendant was entitled to be protected as a bona fide purchaser.

The court did not make special findings of fact, and it is not disclosed upon which theory the court based his judgment. Therefore, the first proposition, which relates to the alleged consent of the plaintiff to the sale of the mortgaged property, requires consideration first.

The plaintiff in error (the defendant) contends and urges at some length that the admission in evidence of the telephone conversation related by the witness Simmons and Amick, as having been had with the plaintiff, or the person or concern styling themselves the "National Bond" of Oklahoma City, was erroneous, because the identity of the person purporting to speak for plaintiff was not established. Plaintiff cites the case of Williamson-Halsell-Frazier Co. v. King, 58 Okla. 120, 158 Pac. 1142, in which case it was said:

"In the application of the rule quoted, it is held that the identity of the person should be established by some testimony, though the evidence may be either direct or circumstantial, as, for example, that witness was acquainted with the person talking and recognize his voice. But such identity must be in some way established. See Chamberlayne's Modern Law Ev., secs. 794, 1741c; Young v. Seattle Transfer Co., 33 Wash. 225, 74 Pac. 375, 63 L. R. A. 988, 99 Am. St. Rep. 942; Murphy v. Jack, 142 N. Y. 215, 36 N. E. 882, 40 Am. St. Rep. 590; Swing v. Walker, 27 Pa. Super. Ct. 366. If a different rule were applied. it would open the door for fraud and imposition, and would result in holding persons responsible for the statements of unidentified persons using their telephone. and such a rule would be without precedent and not sanctioned by any rule of law."

It is unnecessary for us to consider that question, because there is nothing in the testimony on behalf of either the plaintiff or defendant that faintly indicates any intention on the part of the National Bond & Investment Company to waive its lien.

The effect, if any, of the testimony of Simmons in regard to a statement that somebody made over the telephone purporting to emanate from the office of the National Bond & Investment Company, that they had authorized Worrell to dispose of the car, is destroyed by the evidence of Mr. Amick that Amick knew when he was purchasing the car that the mortgage still survived, and that he was buying it subject to the mortgage.

Amick testified that he knew the chattel mortgage was held by this plaintiff; that he knew he or Worrell had to pay it; and that he attempted to protect himself by taking

from Worrell an indemnity or collateral note in the sum of $825, so that in case Worrell did not discharge the chattel mortgage by paying the debt, he would have recourse on Worrell through this written evidence of indebtedness.

It is perhaps a universal rule that a mortgagee, by consenting to a sale of the mortgaged property by the mortgagor, surrenders his lien and looks to the mortgagor personally for the payment of his mortgage. Farmers State Bank v. Cavanaugh, 98 Okla. 119, 224 Pac. 525. But, it must be clearly shown that the mortgagee expressly or by clear implication consented to the sale. Furthermore, where the mortgagee gives his consent to a sale of the mortgaged property, there is no waiver where it is clear that he intended that the property should be sold subject to the lien of the mortgagee, and the purchaser so understands. Murphy v. Currie (Wash.) 57 Pac. 795; Bailey v. Costello, 94 Wis. 87, 68 N. W. 663; Oswald v. Hayes, 42 Iowa, 104; Wichita Mill & Elev. Co. v. Farmers State Bank of Tipton, 102 Okla. 83, 226 Pac. 870.

Assuming, but not deciding, that the testimony pertaining to the alleged consent of the mortgagee to the sale of the automobile, was admissible, there was neither an express nor an implied consent to the sale of this car. There was absolutely no testimony of express consent. The nearest testimony in this connection was the testimony of Simmons, who said that the party speaking over the telephone stated to him that they had authorized Worrell to sell the car. If such really happened, Worrell was unwilling to have the mortgage released; that is, unwilling to be the beneficiary of the release, else he could not have executed to Amick the note in the sum of $825 to indemnify Amick against the mortgage. Worrell, not having sold the property under the alleged authority to sell, but having sold it subject to the mortgage, the purported waiver never had any office to perform, and was never operative. Saxton v. Breshears, 21 Idaho, 333, 121 Pac. 567.

Certainly there was nothing in the surrounding circumstances to indicate, or from which we might infer, that the mortgagee intended to waive its lien on this automobile There was no necessity for waiver of the lien unless a purchaser has been found who wanted to pay cash for the car instead of subjecting it to the usual mortgage. There was no consideration for such an implied agreement, and no reason was shown why a waiver of its lien would have been anything but detrimental to the mortgagee. It is nothing unusual for property, both real and personal, to be sold subject to a mortgage; that is, sold, and, in case the purchaser has either actual or constructive notice of the existence of the mortgage, he acquires only the interest of the mortgagor, and holds subject to the mortgage. On this point, this court, in the case of Wichita Mill & Elev. Co. v. Farmers State Bank of Tipton, supra, has held as follows, which is but a principle of elementary law:

"When the mortgagor of personal property, being in possession before default and having the right of possession under the terms of the mortgage, sells the entire property to another, who has notice of the mortgage, either actual or constructive, the purchaser acquires only the interest of the mortgagor, and holds subject to the mortgage, and in such case, after default, the mortgagee may maintain an action against such purchaser for the wrongful conversion of the property mortgaged."

It is hardly conceivable that one of these finance corporations would, all at once, become so liberal and magnanimous as to waive its property right in a $1,000 automobile, and accept in lieu thereof only a personal obligation of a failing and insolvent concern. If the law were such as to permit the defendant to prevail on this point, the rights of a chattel mortgagee could be destroyed like a phantom. Some person could telephone some clerk in a mortgagee's office and tell him that he was about to trade for the property, and if the mortgagee did not inaugurate a violent protest, the sale of the property would be free from the mortgage lien. Such is not the law.

It is the contention of the defendant that even though consent to the sale of the mortgaged property was not given by the plaintiff, it was entitled to judgment on the theory that it was a bona fide purchaser of the automobile. To constitute one a bona fide purchaser, three essential elements must be present: First, a valuable consideration; second, the absence of notice; and, third, the presence of good faith. It was stated by this court in the syllabus of the case of Berry v. Tolleson, 68 Okla. 158, 172 Pac. 630, that:

"If any one of these essential elements is lacking, a person is not a bona fide purchaser as the term is known to the authorities. 8 C. J. 1146."

Other recent cases by this court, declaring the same rule, are Brooks v. Tucker, 83 Okla. 255, 201 Pac. 643; Beam v. Farmers & Merchants Bank, 121 Okla. 164, 249 Pac. 325; and Filtsch v. McJunkins, 123 Okla. 181, 252 Pac. 437.

· The bank, the defendant, does not contend that it was a purchaser of this property for value, or that it gave a valuable consideration. It does not attempt to show or say that it paid anything for the property or released any security which it could not have revived after learning that its title to the car failed, in whole or in part. Wails v. Farrington, 27 Okla. 754, 116 Pac. 428.

The defendant largely rests this phase of the case upon the contention that the plaintiff had knowledge that the automobile had been permanantly removed from Noble county to Garfield county, and that it should not have waited a time within the 120 days as provided by the statute, but should have filed a certified copy of its mortgage in Garfield county within the three or four days during which time the car was located in that county before it came into the possession of the defendant. That contention is contrary to the express language of the statute, and contrary to the decisions of this court construing this statute. Section 7651, Comp. Stat. 1921; Continental Gin Co. v. Sims, 103 Okla. 191, 229 Pac. 818; Farmers State Bank v. North, etc., Bank, 104 Okla. 248, 230 Pac. 914. The defendant had constructive notice of the defendant. That contention is con- acquired this automobile, the plaintiff had 116 days still within which to file a certified copy of its mortgage in Garfield county.

For the reasons herein stated, the judgment in this case is hereby reversed, with directions to the trial court to ascertain the amount of the indebtedness and interest, and render judgment therefor for plaintiff not to exceed the sum of $1.000 as of the date of the former trial. Hillery v. Waurika National Bank, 100 Okla. 34, 226 Pac. 1051. The accumulated interest after the trial until final judgment may be considered in addition to the sum of $1,000 in case such indebtedness equals or exceeds the sum of $1,000, which was the stipulated value of the automobile.

BENNETT, LEACH, REID, EAGLETON, and DIFFENDAFFER, Commissioners, concur. SWINDALL, J., disqualified and not participating.

By the Court: It is so ordered.