The FIRST NATIONAL BANK & TRUST COMPANY OF OKLAHOMA CITY; Federal Reserve Bank of Kansas City and First State Bank of Seminole, Plaintiffs in Error,

v.

The FIRST NATIONAL BANK AT ARDMORE, F. L. Holton, L. P. King and H. A. Pruitt Produce Co., Inc., Defendants in Error.

No. 37988.

Supreme Court of Oklahoma.

Dec. 23, 1958.

Rehearing Denied Feb. 24, 1959.

Cochran, Dudley, Fowler, Rucks, Baker & Jopling, Oklahoma City, for plaintiffs in error.

Earl Q. Gray, Ardmore, for defendant in error First Nat. Bank at Ardmore.

William G. Davisson, Ardmore, Windham & Windham, Poteau, for defendants in error F. L. Holton & L. P. King.

George & George, Ardmore, for defendant in error H. A. Pruitt Produce Co.

JACKSON, Justice.

This action was brought by First National Bank at Ardmore, as plaintiff,

against First National Bank & Trust Company of Oklahoma City, Oklahoma; Federal Reserve Bank of Kansas City; First State Bank of Seminole, Oklahoma; Guy Eeds, a chicken broker and processor, of Seminole, Oklahoma; F. L. Holton, of Poteau, mortgagee of the truck load of chickens here involved; L. P. King, of Poteau, the owner of the chickens; H. A. Pruitt Produce Co., Inc., of Ardmore, Oklahoma; and other defendants not necessary to mention.

The facts are quite involved. However, the legal propositions are clear. Was the sale of the chickens a cash or credit sale, and did F. L. Holton, the mortgagee of the chickens, waive his mortgage? To answer these questions it is necessary to give a rather extensive statement of the facts and the contentions of the parties.

On January 17, 1955, Guy Eeds entered into an agreement to purchase a truck load of chickens in the vicinity of Poteau belonging to L. P. King. This sale was negotiated by F. L. Holton who held an unrecorded chattel mortgage on the chickens. In fact, Holton was financing a considerable number of chicken growers in the vicinity of Poteau and conducted all of the sales of the chickens for his growers. He had been selling chickens to Guy Eeds (for the growers) over a period of eighteen months. The established custom, agreement, and practice was for Eeds' driver to leave a check or draft when he picked up a truck load of chickens. These checks were usually signed by Eeds but his drivers were authorized to sign a check or draft. It had also been the practice to make the check payable to F. L. Holton and to the owner of the chickens.

On Monday, January 24, 1955, at about 5:00 P.M., Mr. Floyd, agent for Eeds at Seminole, called Mr. Holton at Poteau and told Holton that their driver would be coming through from Muskogee that evening or night, and did not have a check as he had not been back to Seminole, and that the driver would pick up the load of chickens here involved. Holton testified that he told Mr. Floyd that a check would

have to be left before the chickens would leave the property, and that he should have the driver sign and leave a check for the chickens.

The evidence further shows that Eeds' driver arrived in Poteau about eight o'clock that evening; that a crew met the driver at a cafe in Poteau and escorted him to the King farm; that scales for weighing the chickens were provided by Holton, and that King was anticipating a truck and had a loading crew ready when Eeds', truck arrived. Holton knew that Floyd could not provide his driver with a check yet he made no effort to provide one. Floyd did not know King and did not know that he was involved in the transaction. Floyd had instructed the driver to go to a certain cafe in Poteau where he would be met by a crew. The driver testified that several men were waiting for him in a pick-up truck and they took him to the King farm. Holton did not know whether these were his men. He testified that they could have been and that the pick-up truck was probably his. He knew the chickens were weighed on his scales, but did not know how, or by whom, they were transported to the King farm. Significantly, it appears that Holton was the only person in Poteau who knew that Eeds' truck would arrive that evening and that the driver might be without a check.

From the evidence it is certain that Holton's agents, acting under Holton's instructions, took the driver to King's farm and helped load the chickens, yet neither they nor King requested the driver to leave a check. King testified that the driver told him that he had no check, but that he (King) left these matters to Holton.

On the following morning, Tuesday, January 25, Holton called for Eeds by phone and Eeds being absent he talked to Floyd. He testified that he "fussed" at Floyd because of the method in which "this" had been handled but did nothing more than "just fuss" about it. He testified that he intended for everything to happen as it did happen with reference to delivery except the leaving of the check or draft.

He also testified that Floyd told him in that conversation that he (Floyd) would personally promise to see that as soon as the check (from the sale of the chickens by Eeds) got in with the weights on it that he (Holton) would get a check. This arrangement was apparently satisfactory to Holton for he testified that he relied upon Floyd to send him a check.

After the chickens were picked up at King's farm on the night of January 24, 1955, they were sold in Ardmore on January 25, 1955, to H. A. Pruitt Produce Co., Inc., for $2,875.52. Pruitt's check was drawn on the First National Bank at Ardmore.

Thereafter on Friday, January 28, 1955, Holton again talked to Floyd by phone. In regard to that conversation Holton testified:

"He (Floyd) said, 'We are in trouble, some trouble, and Mr. Ellis, the banker (at Seminole), won't let me write a check', and I said, 'Is it—is it serious trouble?' And he says, 'Well, I thought in a day or two we would get it straightened out, but when I found out we couldn't, since I had promised you personally to call you, I called.'"

After this conversation with Floyd on January 28th, Holton called Pruitt Produce at Ardmore and told Pruitt that he (Holton) had a mortgage on the chickens and asked Pruitt to stop payment on the check. Pruitt directed the Ardmore bank to stop payment as requested. Holton further testified:

"I made that call (To Pruitt) upon advice, upon information from Mr. Floyd that there would not be a check coming in spite of his promise, personal promise to me, and that was the reason he had put in this call to me (on January 28th) that he told me that he felt personally obligated to inform me."

Notwithstanding the stop payment order, the Ardmore Bank subsequently paid the check to the Federal Reserve Branch of Kansas City and credit was transmitted back through the collection chain to the Seminole Bank which had previously credited the amount of the Pruitt check to Eeds' account in partial payment of his overdrafts.

Plaintiff, Ardmore Bank, seeks recovery against Pruitt, the maker of the check, on the theory that the stop payment order was without authority of law so that Pruitt is still liable and plaintiff having paid said check is subrogated to the rights of the former holders of the check. In the event recovery cannot be had against Pruitt, plaintiff seeks recovery in the alternative against the defendant collecting banks on the theory that they have received plaintiff's money on an invalid check, and are thereby unjustly enriched. If plaintiff recovers from Pruitt there will be no controversy between the banks.

Plaintiff will recover the full amount of the check from Pruitt if it should be determined that Pruitt received title to the chickens free and clear of any claims of Holton and King. Pruitt has tendered the amount of the check into court by agreement of all the parties. The trial court found that both Holton and King were entitled to recover from Pruitt.

We will first consider the question of whether title to the chickens passed to Eeds, and thereby determine King's right to recover against Pruitt. It is clear to us that Holton, in acting for himself and King, intended at the outset that the chickens would be sold for cash. However, he was in complete charge of the chickens and knew that Eeds' driver would arrive without a check. Yet he did not produce a blank check or draft for the driver's use and did not instruct his employees, or King, to withhold delivery of the chickens until they had received a check for the chickens. We think Holton's conduct shows that he decided to let Eeds have the chickens without a check after he had talked to Floyd at five o'clock P.M. on January 24th. But if we are mistaken in this we think it is abundantly clear that Holton,

acting for himself and King, consented to a credit sale and waived the condition of prepayment on the following day when in the telephone conversation with Floyd he accepted Floyd's promise to send him a check, and relied upon him to do so until January 28th, when Floyd told him, by phone, that he would be unable to keep his promise. He did not assert his mortgage or King's title, or attempt to follow the property until it became clear that a check from Eeds would not be honored. In 77 C.J.S. Sales § 265 b., p. 1063, the author states:

> "Ordinarily an unqualified and unconditional delivery of the goods by the seller to the buyer, without requiring payment or security, provided it is not secured by fraud, will be held to waive a condition as to payment or security, even though the delivery is constructive, or is made to a carrier, as discussed infra subsection b(3) of this section. However, the fact that there has been a delivery without requiring payment or security does not necessarily constitute a waiver of such condition, but is evidence of a waiver, and merely creates a presumption to this effect, which may be rebutted by the acts and declarations of the parties or by the circumstances of the case. * * * In order to constitute a waiver of the condition there must be not only an act of delivery but also an intent not to insist on immediate payment as a condition of the title passing. In a cash, or cash on delivery, sale, if the seller delivers but the buyer violates his promise to pay, the buyer does not acquire title, and, after delivery, the title remains in the seller until payment *unless he waives the right to treat the sale as a cash transaction.* * * *." (Emphasis ours.)

It may be argued that the judgment or findings of the trial court, where a jury has been waived, will not be disturbed upon appeal when it is based upon findings of the court on conflicting evidence. While the evidence is conflicting, and Floyd did testify that there was an agreement to deliver the chickens without receiving a check from the driver, we have been careful to consider the testimony of Holton in its most favorable light and have concluded that his testimony does not support the conclusion that title to the chickens did not pass, as the trial court must have concluded. Since title passed King cannot recover from Pruitt.

We now consider the question of whether Holton can recover from Pruitt.

■ Holton contends that Pruitt's knowledge of his unrecorded mortgage in time to stop payment on the check destroyed Pruitt's status as an innocent purchaser for value since there is no holder in due course involved, and therefore Pruitt is liable to him in conversion.

Assuming that actual knowledge of an *existing* chattel mortgage acquired at such time and under the conditions herein involved would prevent the purchaser from being an innocent purchaser for value, Holton overlooks the fact that there was no existing chattel mortgage for the reason that prior to the time Pruitt purchased the chickens, the mortgage had been discharged by waiver; therefore Pruitt obtained title free of the mortgage even though it had actual knowledge of same.

In National Bond & Investment Co. v. Central Nat. Bank, 142 Okl. 96, 285 P. 828, 831, we said:

> "It is perhaps a universal rule that a mortgagee by consenting to a sale of the mortgaged property by the mortgagor, the mortgagee surrenders his lien and looks to the mortgagor personally for the payment of his mortgage."

It is first contended by Holton that his consent to the sale was conditioned upon Eeds' payment of the purchase price prior to taking the chickens, and since he failed to perform this condition, the consent did not operate as a waiver of the mortgage. This contention must necessarily fail for the reason that we have hereinabove con-

cluded that Holton, acting for King and himself, waived the condition requiring prepayment.

 Holton next contends that even if the prepayment condition was waived there was yet another condition which prevented his consent to the sale from operating as a waiver of the mortgage.

In this connection Holton cites numerous cases to the effect that a mortgagee's consent to the sale of the mortgaged property will not constitute a waiver if the consent is given on condition that the purchaser make payment direct to the mortgagee rather than paying the mortgagor. This is a well established rule. See Annotation in 97 A.L.R. at page 668 for numerous cases recognizing such rule. The rationale of the above rule is that if the mortgagee is looking to the purchaser for payment he is, in effect, still asserting his lien. Holton was obviously looking to Eeds for payment of his mortgage and Eeds had promised to pay him direct, which he failed to do, but there is an additional fact that prevents the application of the above mentioned rule.

 Eeds was a broker and a processor. Holton knew that Eeds had purchased the chickens for resale on the open market. With such knowledge it follows that in consenting that the chickens be sold to Eeds, he further consented that Eeds sell the chickens, and the sale by Eeds would necessarily be without restrictions or conditions of any kind. Having consented to the sale by Eeds without restrictions, the mortgage was waived under the rule announced in National Bond & Investment Co. v. Central Nat. Bank, supra. A similar problem was before this court in Kent v. Wright, 198 Okl. 103, 175 P.2d 802, 804. In that case the plaintiffs sold cattle to one Kuykendall knowing that he was buying them for resale. At the time of the purchase Kuykendall gave a check for the purchase price which was returned for insufficient funds. The next day Kuykendall consigned the cattle to the defendant Wright, a commission merchant, who sold

them the same day. Plaintiff sued Wright for conversion on the theory that the sale was a cash sale and since the check was dishonored, title did not pass.

The defendant made the following contention:

"that since plaintiffs delivered the cattle to Kuykendall with knowledge that he was in the business of dealing in, buying, and selling and shipping cattle, and that he was buying these cattle for resale, they must be presumed to have intended that title should pass to Kuykendall; * * *."

We sustained this contention: In the opinion we said:

"In reaching this conclusion, we have given consideration to our decisions that when personal property is sold for cash and delivered, the vendor taking the vendee's check for the purchase price, which is dishonored on presentation, title to the goods does not ordinarily pass (First National Bank of Byars v. Griffin & Griffin, 31 Okl. 382, 120 P. 595, 49 L.R.A.,N.S., 1020; Mott v. Nelson, 96 Okl. 117, 220 P. 617), and to our decisions holding that mere possession of personal property is not sufficient to estop the real owner from asserting his title as against a person who has dealt with the one in possession on the faith of his apparent ownership. Yonkman v. Harvey, 133 Okl. 252, 271 P. 839; Shannon v. Nicoma Park Development Co., 176 Okl. 53, 54 P.2d 143. The facts above stated distinguish the present case from the cited cases. In those cases the facts do not show a delivery by the vendors with knowledge that the vendees were purchasing the property for resale and would put the property in commerce and deal with third persons as though the property was their own as in the instant case." (Emphasis supplied.)

Though Kent v. Wright involved the question of whether title passed, we think it is in point. There we held that though

title would not ordinarily pass where a check given for the purchase price is dishonored, it must be presumed that the seller did not intend to retain the title when he knew the property was being purchased for resale. Likewise, in the instant case, it must be presumed that the mortgagee did not intend to retain the mortgage when he obviously understood that Eeds would sell the property on the open market.

It might be argued that Kent v. Wright, supra, is distinguishable because in that case the purchaser (commission merchant) paid for the cattle without knowledge of any defect in the title; whereas, in the instant case, Pruitt acquired knowledge of the mortgage in time to stop payment on the check. Any such claimed distinction fails upon proper analysis. In Kent v. Wright, supra, we held that title passed in the first instance because of the seller's presumed intent based upon his knowledge that the cattle were being purchased for resale. So in the instant case the waiver took place at the time Holton consented to the sale knowing that the purchaser was either going to process or sell the chickens immediately. In Fincher v. Bennett, 94 Ark. 165, 126 S.W. 392, 393, the court said:

" * * * where the mortgagee authorizes or gives consent to the mortgagor to sell the mortgaged property, the mortgage lien thereon is discharged. Under such circumstances, a bona fide purchaser for value from the mortgagor obtains a good title to the property, whether he knew of the existence of the mortgage or not."

We are not unmindful of the language in the first paragraph of the syllabus in Bank of Meeker v. Hair, Okl., 261 P.2d 870, which suggests that a purchaser of a morgaged chattel in cases of this kind does not take free of the mortgage unless he was without knowledge of the mortgage. There are other cases containing similar language, but no case has been called to our attention wherein protection was denied the purchaser merely because he knew of the mortgage. In Bank of Meeker v. Hair, the only case cited is Ashcraft v.

Butts, 185 Okl. 587, 95 P.2d 107, 108. The syllabus in that case holds that where the mortgagee knows the mortgaged property is being offered for sale to the public the mortgage is ineffective "against a purchaser from such dealer in the usual course of business." Nothing contained in the syllabus or the body of the opinion requires that the purchaser be without knowledge of the mortgage. We did observe that the facts in that case did not justify a conclusion that the mortgage had been waived because the mortgagor had agreed not to sell the mortgaged property "until he had first settled with the plaintiff," and a waiver involves an intentional relinquishment of a known right. From this we concluded that the proper basis for holding against the mortgagee was on the grounds of estoppel. It is possible that estoppel could not be successfully urged by a buyer who had actual knowledge of the mortgage, but in the instant case we are not concerned with a claimed estoppel. Holton placed no restriction on Eeds' right to resell the property, and therefore, since he knew that Eeds was going to sell the chickens on the open market, he voluntarily relinquished his mortgage at the time he sold the chickens to Eeds.

In Stemmons, Inc., v. Universal C. I. T. Credit Corporation, Okl., 301 P.2d 212, 216, we held that the application of 46 O.S.1951 § 93 was not limited to retail sales and was applicable to a sale by one automobile dealer to another, if such sale was in the ordinary course of trade. Sec. 93 provides as follows:

"All goods, wares, and merchandise sold in the ordinary course of trade shall be free of the lien of such mortgage or pledge in the hands of the purchaser thereof. Laws 1947, p. 304, § 3."

It is to be noted that this statute does not require that the purchaser be an innocent purchaser, or without knowledge of the mortgage. It does require that the property must be sold in the ordinary course of trade. In the Stemmons case we quoted with ap-

 

proval the definition of a buyer in the ordinary course of trade as "one to whom goods are sold for new value, and who acts in good faith and without knowledge of limitation on the liberty of the trustee (mortgagee sic mortgagor) to sell." If as in Ashcraft v. Butts, supra, the purchaser has knowledge of an express limitation on the liberty of the one in possession to sell, then under this definition he would not be a buyer in the ordinary course of trade. But Pruitt had no such knowledge because there were no limitations on the liberty of Eeds to sell. Eeds had unrestricted authority to sell. Pruitt merely had knowledge of a mortgage which had been waived by the mortgagee's act in consenting that the property be resold by Eeds.

■ Holton finally argues that by reason of 46 O.S.1951 § 71, the mortgagee is no longer deemed to have waived his lien by consenting to a sale of the mortgaged property. This section provides that when the mortgagor sells with the consent of the mortgagee while the mortgage is still in force, the mortgagor is a trustee of the proceeds of the sale for the benefit of the mortgagee. It appears that this statute was enacted for the purpose of protecting the consenting mortgagee because he does lose his lien when he unqualifiedly consents to a sale. In any event, it does not have the effect of abrogating the rule that consent to the sale by the mortgagee ordinarily results in a waiver of the lien. The cases cited by Holton construing this statute hold that the mortgagee has a prior right to that of the mortgagor and his creditors to recover the debt owing for the purchase price, but this only means that Holton's right to recover the debt owing from Eeds is prior to King's rights. It cannot be argued that such rule entitles Holton to recover from Pruitt in conversion.

We conclude that neither Holton nor King is entitled to recover from Pruitt, and that therefore plaintiff is entitled to recover the $2873.52 tendered into court by Pruitt. Inasmuch as plaintiff is entitled to recover from Pruitt, it has sustained no loss by reason of paying the check involved.

Therefore, there is no controversy between plaintiff and the other banks as to plaintiff's claimed action for unjust enrichment.

The judgment of the trial court is reversed and remanded, with instructions to set aside the judgment in favor of F. L. Holton and L. P. King against H. A. Pruitt Produce Co., Inc., and to render judgment in the amount of $2,875.52 in favor of plaintiff, First National Bank of Ardmore, against the said H. A. Pruitt Produce Co., Inc. The judgment in favor of First National Bank of Ardmore against the defendants, First National Bank & Trust Company of Oklahoma City, Federal Reserve Bank of Kansas City and First State Bank of Seminole, is reversed and remanded, with instructions to set aside said judgment and render judgment in favor of said defendants.

DAVISON, HALLEY, JOHNSON, BLACKBIRD and CARLILE, JJ., concur.

WELCH, C. J., CORN, V. C. J., and WILLIAMS, J., dissent.