Cecil H. GAMBLE, Clarence J. Gamble, Sidney D. Gamble and Sarah B. Gamble, individually, and also d/b/a Gamble Brothers, a partnership, Plaintiffs,

v.

CORNELL OIL COMPANY, a corporation, and F. E. Harper, Defendants.

No. 6924.

United States District Court
W. D. Oklahoma.

July 8, 1957.

582

Mosteller, Fellers, Andrews & Loving, and Jack Hewett, Oklahoma City, Okl., for plaintiffs.

Robinson, Shipp, Robertson & Barnes, Embry, Crowe, Tolbert, Boxley & Johnson, Coleman Hayes, Lee B. Thompson, and Stanley B. Catlett, Oklahoma City, Okl., for defendants.

WALLACE, District Judge.

The plaintiffs, Clarence J. Gamble and Sarah B. Gamble, Massachusetts, citizens, Sidney D. Gamble, a New York citizen, the Gamble Brothers, an Ohio partnership, and James N. Gamble, an Ohio citizen, executor of the estate of Cecil H. Gamble, who died subsequent to the filing of this action, bring this suit against the defendants, Cornell Oil Company, a Delaware corporation, F. E. Harper, Waldo E. Stephens, Ray Stephens, C. Wayne Stephens and Harold E. Stephens, Oklahoma citizens, to compel the reassignment of certain working interests in leasehold properties located in Caddo County, Oklahoma, because of the alleged breach of a further development contract. The amount in controversy exceeds $3,000 exclusive of interest and costs.

The evidence indicates that on August 19, 1947, plaintiffs entered into a contract with Stephens Petroleum Company, a corporation (now dissolved) whereby plaintiffs agreed to convey to Stephens Petroleum certain working interests in oil and gas leases held by plaintiffs on 930 undeveloped acres located in Caddo

County, Oklahoma.[1] Under this agreement, and as consideration therefor, Stephens Petroleum (while owned and directed by the defendant Stephens brothers) agreed to promptly and efficiently develop[2] this 930 acres and to protect such leases from cancellation.[3] Instruments entitled Assignment and Agreement, were executed and delivered to Stephens Petroleum on September 1 and 2, 1947, assigning plaintiffs' interests in this 930 acres and reserving unto plaintiffs designated overriding royalty interests. These assignments and agreements made no reference to the unrecorded contract of August 19, 1947, and contained no special covenants to develop or protect against drainage. In August, 1949, Waldo E. Stephens (acting on behalf of Stephens Petroleum) communicated with Edgar Z. Wallower (plaintiffs' authorized agent and representative) and requested an extension of time in which to perform the obligations of Stephens Petroleum under the 1947 contract. Wallower made a number of visits to Oklahoma City to determine the status of the development of said leasehold prop-

1. This 930 acres, all located in Township 6 North, Range 10 West of I.M., is more specifically described as: (1) NW/4 SE/4; NW/4 NE/4 SE/4; E/2 NE/4 SE/4; NW/4 SE/4 SE/4; and, SE/4 SE/4 SE/4, Sec. 28, containing 90 acres more or less, known as the Wilhite Lease: (2) NW/4 SW/4; W/2 NE/4 SW/4; SE/4 NE/4 SW/4; NE/4 SE/4 SW/4; and, NE/4 SW/4 SW/4, Sec. 27, containing 90 acres more or less, known as the Farwell Lease: (3) NW/4 NW/4; SW/4 NW/4; NE/4 NW/4; and W/2 SE/4 NW/4, Sec. 27, containing 140 acres more or less, known as the Thompson Lease; (4) N/2 NE/4, Sec. 27, containing 80 acres more or less, known as the Kidd Lease: (5) N/2 SW/4 NE/4; SE/4 SW/4 NE/4; N/2 SE/4 NE/4; SE/4 SE/4 NE/4; NE/4 NW/4 SE/4; S/2 NW/4 SE/4; and, N/2 NE/4 SE/4, Sec. 27, containing 110 acres more or less, known as the Griffin Lease; (6) NW/4 NW/4; NE/4 NW/4; SE/4 NW/4; W/2 SW/4 NW/4; and NE/4 SW/4 NW/4, Sec. 26, containing 150 acres more or less, known as the Heuron Lease; (7) NE/4, Sec. 26, containing 160 acres more or less, known as the Curtis Lease; (8) W/2 NW/4 SE/4; SE/4 NW/4 SE/4; NE/4 SE/4; N/2 SE/4 SE/4; NW/4 SW/4 SE/4; and SE/4 SW/4 SE/4, Sec. 26, containing 110 acres more or less, known as the Melton Lease.

2. As mentioned under Recitals: "Whereas, the first and second parties hereto (which includes plaintiffs) each separately owns an undivided interest in and to the oil and gas leases, leasehold estates, producing wells thereon, and the equipment therein and upon said leases, and desire to further develop said leases and leasehold estates, and have requested third party to undertake the further development thereof; and Whereas, said third party is willing and financially able to further develop said oil and gas leases and leasehold estates, and desires to undertake such further development." And, as stated in numerical paragraph (6) of the contract: "The main consideration for the sale, transfer and assignment of said undeveloped portion of said leases and leasehold estates is the prompt, diligent and efficient development and operation thereof, and said third party (Stephens Petroleum) hereby agrees and obligates itself in due course to diligently and efficiently develop and operate said leases and the producing wells thereon, at its expense, except as hereinafter provided."

3. Numerical paragraph (7) provides in part: "As to the development program of said undeveloped portion of said leases, the said third party is to drill such wells as it deems necessary and essential to properly develop and protect said leases, and it has the sole discretion as to the selection of the location of the well or wells to be drilled and the depth thereof, and in the absence of bad faith or fraud upon its part shall not be liable for mistake and/or bad judgment in this regard. * * *" Paragraph (8) states in part: "The parties hereto contemplate that it may require at least two years time to carry out and complete the drilling program necessary to develop and protect said leases. * * *" And, paragraph (9) provides: "If, during the development program provided for herein, a royalty owner or person claiming an interest in any or all of the undeveloped portions of said leases, or any of them, institutes an action for the cancellation of such leases, or any of them, then said third party shall defend such action or actions at its own expense and hold and protect said first and second parties harmless on account thereof."

erties. During these visits Waldo E. Stephens conceded that the development undertaken was not measuring up to that required by the Contract of Development but promised that more development would be forthcoming. As a result of these conversations with Waldo E. Stephens, and because of the general financial condition of Stephens Petroleum, Wallower orally agreed that Stephens Petroleum be given additional time in which to further develop. By four instruments entitled Assignment and Agreement, all dated April 28, 1952, plaintiffs assigned unto Stephens Petroleum their undivided interests in certain oil and gas leases covering acreage excluded from the 1947 assignments and then owned by the plaintiffs under the Thompson, Wilhite, Melton, and Heuron Leases.[4] These transfers were made as a result of Waldo E. Stephens' ·representations that such conveyances would aid Stephens Petroleum in carrying out the development program called for under the 1947 contract.

On April 20, 1953, Stephens Petroleum filed its voluntary petition for reorganization under the Federal Bankruptcy Act.[5] At such time, the stock of Stephens Petroleum was owned completely by the defendant Stephens brothers, who were also the directors of Stephens Petroleum.

From the time Stephens Petroleum acquired these properties from the plaintiffs until the filing of the bankruptcy petition, Stephens Petroleum drilled eleven wells on these six leases. Three were drilled in 1948; two in 1949; one in 1950; four in 1951; and one in 1952.[6]

On or about December 10, 1954, Cornell Oil Company and F. E. Harper and their representatives, together with Waldo E. Stephens, met to discuss the possibility of Cornell Oil Company and F. E. Harper (hereinafter referred to as Harper and Cornell) acquiring the Stephens Petroleum Company properties. At the conclusion of this meeting the parties present agreed that Dr. Anson L. Clark, president of Cornell and major stockholder, and also president and stockholder of the Indian Royalty Company, should obtain $200,000 from a bank in Lubbock, Texas, to deposit ·on behalf of Indian Royalty with the trustee in bankruptcy to stay the bankruptcy proceedings pending the final consummation of the sale of the Stephens Petroleum properties. On December 13, 1954, Indian Royalty obtained all of the Stephens Petroleum stock and at the same time agreed to and did deposit $200,000 with the bankruptcy court. Indian Royalty

---

4. Excluded from these latter assignments were wells located on the acreage assigned, insofar as the horizons from which such wells were producing. These assigned interests are specifically described as: (1) SW/4 SW/4 SE/4; NE/4 SW/4 SE/4; NE/4 NW/4 SE/4; and, SW/4 SE/4 SE/4, Sec. 26-6N-10W, Caddo County, Oklahoma (Melton Lease) *except* horizons which were producing oil and gas at the time of assignment. (2) SE/4 SE/4 NW/4; and NE/4 SE/4 NW/4, Sec. 27-6N-10W, Caddo County, Oklahoma (Thompson Lease). (3) NE/4 SE/4 SE/4; SW/4 NE/4 SE/4; and NE/4 SW/4 SE/4, Sec. 28-6N-10W, Caddo County, Oklahoma (Wilhite Lease) *except* horizons producing oil and gas at the time of assignment. (4) SE/4 SW/4 NW/4, Sec. 26-6N-10W, Caddo County, Oklahoma (Heuron Lease) *except* the Fortuna horizon producing oil and gas at that time between the depths of 2,113 and 2,370 feet.

5. See 11 U.S.C.A. § 501 et seq. (Case No. 8968, W.D.Okl.)

6. The wells drilled were: (1) Heuron No. 2 (oil), SE/4 SE/4 NW/4, Sec. 26-6N-10W; Heuron No. 3 (oil), SW/4 SW/4 NW/4, Sec. 26-6N-10W; Nellie No. 1 (oil), NW/4 NW/4 SE/4, Sec. 26-6N-10W (1948). (2) Richard No. 1 (dry), SE/4 NE/4 NW/4, Sec. 27-6N-10W; Curtis No. 2 (dry), SW/4 SW/4 NE/4, Sec. 26-6N-10W (1949). (3) Richard No. 2 (oil), NW/4 SE/4 NW/4, Sec. 27-6N-10W (1950). (4) Samwil (Wilhite) No. 3 (oil), SE/4 SE/4 SE/4, Sec. 28-6N-10W; Samwil No. 4 (dry), NW/4 NW/4 SE/4, Sec. 28-6N-10W; Samwil No. 5 (oil), NW/4 SE/4 SE/4, Sec. 28-6N-10W; Kidd No. 3 (dry), SE/4 NW/4, NE/4, Sec. 27-6N-10W (1951). (5) Richard No. 3 (oil), NE/4 SW/4 NW/4, Sec. 27-6N-10W (1952).

further agreed that as soon as the reorganization proceedings had progressed to the point where such was possible, it would transfer to the Stephens brothers a carried working interest in certain oil and gas leaseholds in Caddo and Grady Counties, Oklahoma, in an amount of twenty per cent below a depth of 6,000 feet. Also, Indian Royalty agreed to subsequently employ the Stephens brothers for a total of $2,800 per month until they were paid $100,000. On December 11, 1954, John B. Moore, an employee of Harper, went to the Stephens Petroleum offices to obtain abstracts of title and title opinions on the properties involved in the transaction. On January 7, 1955, the officers of Stephens Petroleum resigned; and, the directors, consisting of T. Dwight Williams (vice president of Indian Royalty), Fred Stewart and John B. Moore (employees of Harper) elected new officers consisting of T. Dwight Williams, president; Fred Stewart, vice president; and John B. Moore, secretary-treasurer. On this same day Harper and Cornell advanced Indian Royalty $1,400,000 to enable Indian Royalty to deposit the same with the bankruptcy court so that Stephens Petroleum creditors could be paid in full. This $1,400,000 loan was secured by the pledge of Stephens Petroleum stock; and was evidenced by two promissory notes given by Indian Royalty. On January 8, 1955, Indian Royalty gave Harper and Cornell an option to buy all the assets and properties of Stephens Petroleum, subject to the reservation of a production payment by Indian Royalty for a sum which would allow Indian Royalty a profit on the transaction of approximately $25,000.

On January 26, 1955, the trustee in bankruptcy was discharged; and, on January 28, 1955, all Stephens Petroleum creditors were paid in full from the funds deposited with the court by Indian Royalty.[7] Immediately following the discharge of the trustee in bankruptcy steps were taken to dissolve Stephens Petroleum; and, Mr. John B. Moore of Harper Oil Company requested the employees of Stephens Petroleum to continue in their employment and assist in such dissolution.

On February 16, 1955, Stephens Petroleum sold all its leasehold properties to Harper and Cornell reserving a production payment of $1,000,000 plus interest at six per cent on the unrecovered balance, computed monthly, payable out of an undivided ¾ of the oil and gas produced. And, soon thereafter this production payment was transferred by Stephens Petroleum to Fort Worth Charitable Corporation of Texas. This assignment of Stephens Petroleum to Harper and Cornell provided that all production from the assigned producing properties would be effective as of February 1, 1955. And, the assignment was made from Stephens Petroleum directly to Harper and Cornell to eliminate the cost and extra detail which would be involved if the conveyance had first been made to Indian Royalty.

The evidence of record indicates that the defendants first received actual knowledge of the sued upon and unrecorded development contract sometime early in February, 1955.[8]

From the time these properties were acquired by Harper and Cornell up until September 13, 1955, when demand for reassignment was made, Harper and Cornell drilled seven wells; these seven wells offset wells on other leases situated north of the border of the properties herein involved. The first well was completed in April, 1955; and, of these seven wells drilled two were considered commercial and five non-commercial.[9]

---

7. Plaintiffs were among the Stephens Petroleum creditors, filing claims in excess of $100,000, and like all other creditors were paid.

8. Moore was told of this contract by Waldo E. Stephens sometime prior to February 15, 1955; and, Edgar Z. Wallower discussed such contract of development with F. E. Harper on February 10, 1955, in Scottsdale, New Mexico.

9. The location of these wells is more particularly described as: (1) Kidd No. 4 (oil), NE/4 NE/4 NE/4, Sec. 27; (2) Heuron No. 4 (oil), NW/4 NE/4 NW/4,

The evidence further indicates that no drainage of consequence has occurred touching the properties herein involved.[10]

Upon a platform supported by these cardinal facts, we turn to the legal issues.

■ The defense of statute of limitations is untenable. The sued upon contract was executory in character and the alleged breach occurred only just prior to the institution of this suit.[11] Although the contract did not expressly spell out the time for which it was to run, the contract's effective time was extended and kept in force by mutual consent. This agreement had two definable objectives with the fulfilment of each governed by a different time standard. First, Stephens Petroleum was required to drill necessary offsets within two years of the contract's execution, with plaintiffs retaining the right to demand reconveyance should such offset requirements not be met.[12] In addition, and also in consideration of the transfer of these properties, Stephens Petroleum promised to "diligently further develop" these leasehold estates. The time limit on this latter obligation was somewhat flexible being dependent upon, among other things, the circumstances existing in light of producing wells on each lease and the fact that the limits of production from each lease had not yet been determined.[13] Stephens Petroleum had the discretion as to the well locations, but not as to the basic requirement that reasonable diligence in development be exercised. And, in this regard, the provision insulating Stephens Petroleum from liability except for "bad faith or fraud" applied only to the company's action on the discretionary matters.[14] Basically, the contract called for a reasonably intensive program on a 10-acre step-out basis from established production until Stephens Petroleum had either drilled all such locations or had developed information which illustrated that further drilling would not be commercially profitable. And, even though Stephens Petroleum did not further develop within the time originally intended, the agreed upon extension of time by the plaintiffs kept the contract from being breached up to the time Stephens Petroleum filed its petition in involuntary bankruptcy in April of 1953. This contract was unbreached and in effect at such time.[15] Moreover, inasmuch

---

Sec. 26; (3) Heuron No. 5 (oil), NE/4 NE/4 NW/4, Sec. 26; (4) Heuron No. 1–A (oil), NE/4 NW/4 NW/4, Sec. 26; (5) Heuron No. 2–A (oil), NW/4 NW/4 NW/4, Sec 26; (6) Curtis No. 1–A (oil), NE/4 NE/4 NE/4, Sec. 26; and, (7) Curtis No. 2–A (oil), NW/4 NW/4 NE/4, Sec. 26.

10. The offset well to the north of the Curtis Lease is non-commercial, and produced no oil during November of 1956. Also, the four offset wells drilled along the northern edge of these properties, some sixty days before the instant trial, have not yet drained these properties to any appreciable extent.

11. 12 Okla.Stat. § 95 provides: "Civil actions, other than for the recovery of real property, can only be brought within the following periods, after the cause of action shall have accrued, and not afterwards: First. Within five years: An action upon any contract, agreement or promise in writing."

12. Paragraph (15) provides in part: "The third party is hereby given two (2) years from the date of the execution and delivery of this contract within which to protect, by development, said undeveloped leases against cancellation. As to any of said undeveloped leases which have not been protected under the development program provided for herein within said two-year period, said third party hereby agrees and obligates itself to reassign to said first and second parties the interest which it acquired from them in such lease or leases free and clear of all claims of every kind and character of said third party, or any one claiming under it, and in this connection said third party agrees to protect and hold them harmless from any and all such claims. * * *"

13. See in particular paragraphs (6) quoted in footnote 2, supra, and paragraphs (7) and (8) quoted in footnote 3, supra.

14. See paragraph (7) quoted in footnote 3, supra.

15. Conceivably, the filing of this voluntary petition in bankruptcy gave plaintiffs the right to consider this execu-

as the drilling activity of Harper and Cornell between the time they took over these properties and this action was brought measured up to further development requirements, the contract could not be deemed breached by Harper and Cornell, if applicable to them, until they repudiated liability thereunder just prior to this suit.[16]

Nor do the bankruptcy proceedings bar this action. Such proceedings kept all parties in status quo during the time thereof but the bankruptcy court's decree did not alter the rights of either party under the contract because of the executory nature of the agreement. The trustee gave neither notice nor made reference to this contract as a claim; and, the court had no intention of affecting the rights of parties doing business with Stephens Petroleum under unexecuted business agreements. Moreover, no plan of organization, as such, was ever submitted to or voted upon by the creditors or approved by the court. The court's final decree merely confirmed the payment in full of all creditors and dismissed Stephens Petroleum from the court's jurisdiction.[17]

It is undisputed that plaintiffs fully performed all the contractual requirements expected of them. Moreover, it is clear that plaintiffs, themselves, did not receive the full consideration, by way of further development, for which they bargained. And, on the merits, the paramount issue is whether or not Harper and Cornell, as holders of the properties originally assigned by plaintiffs to Stephens Petroleum, were bound by the terms of the sued upon executory contract, and thus guilty of a breach thereof by denying responsibility thereunder.

Under the evidence, Harper and Cornell must be viewed as holding these properties without *actual* notice of the sued upon unrecorded further development agreement. Although these purchasing defendants were advised of the existence of this contract just prior to the date carried by the assignments, this information came to Harper and Cornell long after they had committed themselves to purchase these properties and had irretrievably altered their position.

Moreover, although Indian Royalty doubtless acted as agent for Harper and Cornell in acquiring these properties, inasmuch as Indian Royalty did not have actual knowledge of this agreement prior to the consummation of this transaction Harper and Cornell cannot be charged with imputed knowledge. It may well be that Indian Royalty as owner and purchaser of Stephens Petroleum was chargeable with knowledge of the sued upon agreement inasmuch as it was a part of the corporate records owned by Indian Royalty as a result of the acquisition of the Stephens Petroleum stock. However, Harper and Cornell cannot be held to have such notice inasmuch as they never themselves owned Stephens Petroleum so as to be directly chargeable with the affairs of the corporation; and, knowledge imputed to Indian Royalty cannot be considered reimputed to the principal, Harper and Cornell. The basis for charging a principal with knowledge held by an agent

tory contract repudiated and to rescind the agreement. See 17 C.J.S. Contracts § 471, and cases cited therein. However, no right to rescission could now exist inasmuch as equity demands that such enforceable right be promptly and diligently asserted. As observed in 12 Am.Jur. § 447: "A right to rescind, abrogate, or cancel a contract must be exercised promptly on discovery of the facts from which it arises; it may be waived by continuing to treat the contract as a subsisting obligation. * * *" Also, see 12 Am.Jur. § 449, and cases cited therein.

16. During the seven months Harper and Cornell had free control of the litigated properties seven wells were drilled. And, such must be deemed "diligent development".

17. Since no plan of reorganization was approved by the creditors or confirmed by the court, the final order which authorized the payment in full of all creditors and dismissed the proceedings, amounted to an outright dismissal under section 636 of Title 11, U.S.C.A., rather than a dismissal under the reorganization sections 621–628 of Title 11.

rests in the presumption that all information actually possessed by the agent will be conveyed to its principal. No such presumption can exist where the agent is without *actual* knowledge.[18]

Moreover, although the Stephens brothers do not hold the "carried working interest of 20% below the depth of 6,000 feet" as purchasers without notice, plaintiffs have not shown themselves entitled to the requested relief of a reconveyance to plaintiffs of such interests. Understandably the plaintiffs feel anything but kindly toward the Stephens brothers individually. Plaintiffs were considerate to the extreme in extending the time for further development under the sued upon agreement. And, doubtless much of plaintiffs' patience was traceable to the confidence they had in the Stephens brothers personally. However, plaintiffs contracted with Stephens Petroleum, and neither Stephens Petroleum nor the Stephens brothers breached a legal duty owed in selling the company's stock to Indian Royalty.[19] And, although Stephens Petroleum (while owned and controlled by the Stephens brothers) may have committed a technical breach of the notice provision of the agreement in contracting with Indian Royalty to convey these carried working interests to the Stephens brothers, there is no evidence of record indicating the damage, if any, flowing from such breach. In addition, although Stephens Petroleum (while owned by Indian Royalty) may well have breached this same notice provision in conveying the instant properties to Harper and Cornell without first giving the plaintiffs an opportunity to purchase them on the same terms;[20] and, Stephens Petroleum by this same act may have committed a material breach of the further development contract inasmuch as it voluntarily placed itself in a position where it could not perform the further development commitments; however, there is no evidence before the court showing the amount, if any, of damage flowing from either of these breaches. Moreover, Indian Royalty, who as owner of Stephens Petroleum at the time of the company's dissolution would be accountable for these latter breaches if proved damage resulted therefrom, is not even a party to this action.

The defendants are entitled to judgment. Within 10 days counsel should submit a journal entry of judgment which conforms with this opinion.

18. See First State Bank of Keota v. Bridges, 1913, 39 Okl. 355, 135 P. 378; Allen & Scott, Inc., v. Stahl, 181 Okl. 527, 75 P.2d 204; also, see Wheatland v. Pryor, 1892, 133 N.Y. 97, 30 N.E. 652, 653; Ragsdale v. Bothman, 1928, 81 Mont. 408, 263 P. 972.

19. The relied upon notice provision, paragraph 14, states: "If the third party finds it necessary or advisable to sell and dispose of any or all of the interest which it acquires from the first and second parties in said undeveloped leases, or any part thereof, and notifies them, in writing, of its intention so to do and gives them the bona fide offer made by a reliable purchaser, then the said first and second parties, jointly or separately, shall have the right to acquire and/or purchase such interest for and upon the bona fide offer made to said third party, and shall be given fifteen (15) days from the receipt of said notice within which to determine whether or not they, or either of them, will purchase such interest. If they, or either of them, do not exercise such option within said time, then said third party may consummate said sale." It is apparent that the mere sale of Stephens Petroleum stock could not constitute a selling or disposing of the instant properties by Stephens Petroleum within the contemplation of this notice provision.

20. The language of the notice provision if taken literally did not place an absolute duty upon Stephens Petroleum to give notice before disposing of these properties but provided, "*If* the third party (Stephens Petroleum) finds it necessary or advisable to sell and dispose of any or all of the interest * * * *and* notifies them (plaintiffs) in writing, * * *". (Emphasis added.) However, if damages had been proved the court would be inclined to rule that the contracting parties intended that such notice be required. (See fn. 19, supra, for notice provision.)