260 F.2d 860
 James N. GAMBLE, Executor of the Estate of Cecil H. Gamble,
deceased, Clarence J. Gamble, Sidney D. Gamble and Sarah B.
Gamble, individually, and also doing business as Gamble
Brothers, a partnership, Appellants,
v.
CORNELL OIL COMPANY, a corporation, F. E. Harper, Waldo E.
Stephens, Ray Stephens, C. Wayne Stephens and
Harold G. Stephens, Appellees.
 No. 5764.
 United States Court of Appeals Tenth Circuit.
 Oct. 13, 1958.
 
 John Joseph Snider and Herbert F. Hewett, Oklahoma City, Okl (L. Karlton Mosteller and Mosteller, Fellers, Andrews & Loving, Oklahoma City, Okl., of counsel, were with them on the brief), for appellants.
 V. P. Crowe and Coleman Hayes, Oklahoma City, Okl. (T. Murray Robinson, Coleman Hayes, Stanley B. Catlett, V. P. Crowe, Val R. Miller and Lee B. Thompson, Oklahoma City, Okl., were with them on the brief), for appellees.
 Before BRATTON, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 James N. Gamble, Executor of the estate of Cecil H. Gamble, deceased, Clarence J. Gamble, Sidney D. Gamble and Sarah B. Gamble, individually, and as members of Gamble Brothers, a partnership,[1] brought this action against Cornell Oil Company,[2] a corporation, F. E. Harper, Waldo E. Stephens, Ray Stephens, C. Wayne Stephens and Harold G. Stephens, seeking a decree cancelling certain assignments of oil and gas leases, hereinafter more particularly referred to, except as to the horizons from which Cornell and Harper were producing oil, and to recover damages for alleged drainage from the properties covered by such leases.
 
 
 2
 From a judgment in favor of the defendants below, the plaintiffs have appealed.
 
 
 3
 On August 19, 1947, Ray Stephens, Inc. and Gamble Brothers, a partnership consisting of Cecil Gamble, Clarence Gamble and Sidney D. Gamble,[3] were the owners of undivided interests in eight oil and gas leases situated in Caddo County, Oklahoma, known as the Wilhite, the Thompson, the Kidd, the Heuron, the Curtis, the Melton, the Farwell and the Griffin Leases, respectively.[4] They had acquired such leases prior to the year 1940. On August 19, 1947, they entered into a contract[5] for the further development and operation of such leases with Stephens Petroleum Company.[6] In the development contract Ray Stephens, Inc. was designated as party of the first part, the partnership and the individual members thereof were designated as parties of the second part, and the Stephens Company was designated as party of the third part. In the development contract the party of the first part and the parties of the second part agreed simultaneously with the execution and delivery thereof, to execute and deliver appropriate written instruments selling and transferring the combined undivided interest in the undeveloped portion of each of such leases to the Stephens Company, reserving however, to the party of the first part and parties of the second part certain stipulated overriding royalties in the working interests in such leases.
 
 
 4
 Other provisions of the development contract here pertinent read as follows:
 
 
 5
 '(6) The main consideration for the sale, transfer and assignment of said undeveloped portion of said leases and leasehold estates is the prompt, diligent and efficient development and operation thereof, and said third party hereby agrees and obligates itself in due course to diligently and efficiently develop and operate said leases and the producing wells thereon, * * *
 
 
 6
 '(7) As to the development program of said undeveloped portion of said leases, the said third party is to drill such wells as it deems necessary and essential to properly develop and protect said leases, and it has the sole discretion as to the selection of the location of the well or wells to be drilled and the depth thereof, and in the absence of bad faith or fraud upon its part shall not be liable for mistake and/or bad judgment in this regard. * * *
 
 
 7
 '(8) The parties hereto contemplate that it may require at least two years time to carry out and complete the drilling program necessary to develop and protect said leases. Said third party, within days from the date of the execution and delivery of this contract, shall commence the development of the undeveloped portions of said leases and continue such development with due diligence to the best of its ability until such undeveloped portions of said leases have been developed and protected. * * *
 
 
 8
 '(15) The third party is hereby given two (2) years from date of the execution and delivery of this contract within which to protect, by development, said undeveloped leases against cancellation. As to any of said undeveloped leases which have not been protected under the development program provided for herein within said two-year period, said third party hereby agrees and obligates itself to reassign to said first and second parties the interest which it acquired from them in such lease or leases free and clear of all claims of every kind and character of said third party, or any one claiming under it, and in this connection said third party agrees to protect and hold them harmless from any and all such claims. * * *
 
 
 9
 '(21) This contract shall not be placed of record except upon failure of said third party to carry out and perform the terms and provisions thereof. In this connection, however, said first and second parties may determine when and under what circumstances they will file this contract for record. * * *'
 
 
 10
 The contract was never recorded.
 
 
 11
 On September 2, 1947, Ray Stephens, Inc. and the partnership executed and delivered to the Stephens Company a separate assignment and agreement as to each of such leases, whereby Ray Stephens, Inc. and the partnership transferred the undeveloped portion of each of such leases to the Stephens Company and the Stephens Company transferred to the partnership a 1/32 overriding royalty in the working interest in such undeveloped portion of each of such leases.
 
 
 12
 The assignments were duly recorded in April, 1948, in the office of the County Clerk of Caddo County, Oklahoma. Such assignments made no reference to the unrecorded development contract, contained no express convenants to develop or protect against drainage, and provided that they would continue in force as long as the oil and gas leases, or any extension or renewal thereof, covering the acreage described in the assignments, should remain in full force and effect.
 
 
 13
 Prior to the execution of the development contract there had been very little development on the leases and there had been no drilling activity on the Wilhite Lease since October 30, 1945; on the Thompson, Heuron and Curtis Leases since 1939; on the Kidd Lease since 1941, and on the Melton Lease since 1944. The Stephens Company drilled three wells in 1948; two wells in 1949; one well in 1950; four wells in 1951, and one well in 1952 on the acreage covered by such assignments.
 
 
 14
 In April, 1952, the partnership assigned to the Stephens Company certain undivided interests in the Thompson, Wilhite, Melton and Heuron Leases, which had been previously excluded from the 1947 assignments. The 1952 assignments were duly recorded on June 5, 1952, in the office of the County Clerk of Caddo County, Oklahoma. Such assignments contained no reference whatever to the development contract and contained no express covenants to develop or protect against drainage. Neither the plaintiffs nor the partnership has ever sought to recover the interests transferred by such assignments.
 
 
 15
 At all times here material after September, 1947, Edgar Z. Wallower acted as the representative of the partnership and its individual members in all matters with respect to the development contract and their interests in the leases.
 
 
 16
 On March 11, 1949, Waldo E. Stephens, acting for the Stephens Company, wrote a letter to Wallower in which he stated, among other things, that the two-year period for the development of the undeveloped portion of the leases covered by the contract was nearing termination and, for reasons set forth in the letter, asked for an extension of time for the completion of such development program. Shortly thereafter Wallower and Waldo E. Stephens agreed that the Stephens Company should have such extension of time, but no specific period of extension was fixed.
 
 
 17
 On April 20, 1953, the Stephens Company filed a voluntary petition for reorganization under Chapter 10 of the Federal Bankruptcy Act (11 U.S.C.A. 501 et seq.). At such time all the stock in the Stephens Company was owned by four brothers, Waldo E. Stephens, Ray Stephens, C. Wayne Stephens and Harold G. Stephens, who were also the directors and officers of the corporation. Efforts to reorganize had not been successful and in the latter part of 1954 the court entered an order directing that effective steps looking to reorganization should be taken on or before December 13, 1954.[7]
 
 
 18
 On December 10, 1954, Waldo E. Stephens, Executive Vice President of the Stephens Company, Anson L. Clark, President of Cornell and President of Indian Royalty Company[8] and Harper had a conference at Harper's home for the purpose of considering the acquisition of the oil properties of the Stephens Company by Cornell and Harper. At such conference it was agreed that Clark would obtain a $200,000 bank loan and deposit the same on behalf of the Royalty Company with the trustee in bankruptcy to stay the proceedings until the sale of the properties of the Stephens Company could be consummated. Thereafter, on December 13, 1954, a written agreement was entered into between the four Stephens brothers, owners of all the stock of the Stephens Company, and the Royalty Company by which it was provided that on or before December 13, 1954, the Royalty Company would deposit in the registry of the bankruptcy court $200,000, pursuant to the plan of reorganization proposed to the court in the reorganization proceedings by the Stephens brothers, on December 6, 1954. The agreement recited that the Royalty Company had purchased and the Stephens brothers had transferred and delivered to it all of the issued and outstanding capital stock of the Stephens Company, consisting of 20,000 shares. The agreement further provided that when the reorganization proceedings had progressed to the point where it was legally possible so to do that the Royalty Company would transfer to the Stephens brothers 20 per cent of the working interest of the Stephens Company in certain oil and gas leases owned by the Stephens Company below the depth of 6,000 feet from the surface.
 
 
 19
 On December 13, 1954, the bankruptcy court entered an order that an additional $1,400,000 be deposited with the clerk of the bankruptcy court on or before February 7, 1955. Information was furnished to Cornell, Harper and the Royalty Company with respect to the properties and assets of the Stephens Company, including its producing leases, and the amount of its indebtedness, and Cornell, Harper and the Royalty Company were given a short period of time to satisfy themselves as to the titles of the Stephens Company properties.
 
 
 20
 Thereafter, and on about December 16, 1954, John B. Moore, an employee of Harper, and Harper's lawyers began an investigation of abstracts of title and title opinions on the leases involved in the instant case and other properties of the Stephens Company.
 
 
 21
 On January 7, 1955, Cornell and Harper advanced to the Royalty Company $1,400,000 to be deposited by the Royalty Company with the clerk of the bankruptcy court to provide funds, together with the $200,000 theretofore deposited, from which the claims of the Stephens Company would be paid in full.
 
 
 22
 On January 7, 1955, the officers of the Stephens Company resigned. T. Dwight Williams, Vice-President of the Royalty Company, John B. Moore, an employee of Harper, and Fred Stewart were elected as Directors and they in turn elected T. Dwight Williams President, Fred Stewart Vice-President and John B. Moore Secretary-Treasurer of the Stephens Company.
 
 
 23
 On January 8, 1955, the Royalty Company entered into an agreement with Cornell and Harper. The contract recited that the Royalty Company was the owner of all the issued and outstanding capital stock of the Stephens Company, now in process of reorganization in bankruptcy in the United States District Court for the Western District of Oklahoma; that at a special meeting of the stockholders and directors of the Stephens Company, held on January 7, 1955, it was unanimously resolved to liquidate the Stephens Company as soon as the plan of reorganization proposed on December 6, 1954, had been consummated and the trustee in bankruptcy discharged and to distribute all of the assets of the Stephens Company to the Royalty Company as sole stockholder and that the Royalty Company was desirous of disposing of the assets of the Stephens Company. The agreement further provided:
 
 
 24
 'As additional consideration for the sum of One Million Six Hundred Thousand ($1,600,000.00) Dollars loaned by Cornell and Harper to Indian to enable Indian to pay off the creditors of Stephens Petroleum Company and to reorganize said Company under Chapter X of the Bankruptcy Act, Indian grants unto Cornell and Harper, jointly and severally, the option, for a period of 120 days from the date hereof, to purchase the assets, including cash, received by Indian upon the liquidation of said Stephens Petroleum Company, upon the following terms and conditions:'
 
 
 25
 It further provided that the Royalty Company would reserve a production payment, payable with interest at five per cent, out of 65 per cent of the production of the properties of the Stephens Company; and that:
 
 
 26
 'The assets of Stephens Petroleum Company, including cash, are to be sold, assigned and delivered to Cornell and Harper, subject to the above mentioned production payment or payments, for a cash price which, added to the face amount of the production payment or payments reserved, will exceed by Twenty Five Thousand ($25,000.00) Dollars the sums advanced by Indian to carry out the reorganization of Stephens Petroleum Company and the discharge of the Trustee in Bankruptcy.'
 
 
 27
 On January 25, 1955, Cornell and Harper, having satisfied themselves with respect to the titles of the properties of the Stephens Company, both from abstracts of title and from an examination of the documents in the files of the Stephens Company, advised the Royalty Company that they would accept the properties embraced in the agreement of January 8, 1955, on the terms therein expressed and further agreed that the $1,600,000 deposited with the clerk of the bankruptcy court might be disbursed in payment in full of the claims of the creditors of the Stephens Company. On January 26, 1955, the trustee in bankruptcy was discharged. By January 28, 1955, the clerk of the bankruptcy court had paid in full all of the claims of the creditors of the Stephens Company from the moneys advanced by Cornell and Harper through the Royalty Company. Among the claims so filed was a claim filed by the partnership for an amount in excess of $100,000, which was wholly unrelated to the development contract or any of the other matters involved herein.
 
 
 28
 A special meeting of the Board of Directors of the Stephens Company was held on February 10, 1955. The minutes of that meeting recited that on January 7, 1955, all of the assets of the Stephens Company became the assets and property of the 'Royalty Company and minority stockholders, there remaining only the actual preparation of the written instruments necessary to evidence such transfer of title and that subsequently * * * Royalty Company and other stockholders had entered into negotiations resulting in an agreement for the sale of such properties to * * * Harper and Cornell * * * and that the * * * Royalty Company desired this Board of Directors to pass the necessary resolution to enable the transfers to go directly from this company to * * *' Cornell and Harper in order to avoid the additional cost which would ensue if the properties were first transferred to the Royalty Company and then transferred by it to Cornell and Harper.
 
 
 29
 The minutes further recited that there was presented to the Disreitors a proposed contract for the sale of the Stephens Company's producing leases to Cornell and Harper for a cash consideration of $360,000, subject to a reserve production payment for the sum of $1,000,000, 'payable out of 3/4' of the Stephens Company's interest in all of such assigned leases and that a form of assignment was presented.
 
 The minutes further recited:
 
 30
 '* * * The following Resolution was then made, seconded and unanimously adopted:
 
 
 31
 "Resolved that the officers and directors of the company be, and they are hereby authorized to execute the contract of sale of all of its producing leases presented to the company by F. E. Harper and Cornell Oil Company, for a consideration of $360,000.00 in cash, the assignment of such leases to contain a reservation of a production payment in the net sum of $1,000,000.00, plus a sum equal to 6% interest on the unrecovered balance of such production payment, said payment to be payable out of the sale of 3/4 of the company's interest in the production from all such leases.'
 
 
 32
 'The following Resolution was then made, seconded and unanimously adopted:
 
 
 33
 'Resolved that, the considerations provided in said contract of sale having been delivered unto the company, the officers of the company be, and they are hereby authorized to execute and deliver an assignment of all the company's producing leases unto F. E. Harper and Cornell Oil Company, in equal shares, on the form of assignment submitted to the Board, which form of assignment contains a reservation of a production payment in the net sum of $1,000,000.00, plus a sum equal to 6% interest on the unrecovered balance thereof, payable out of 3/4 of all of the company's interest in such leases."
 
 
 34
 On February 16, 1955, the Stephens Company executed and delivered to Cornell and Harper an assignment of the leases and properties described in the minutes of the meeting of February 10, 1955, and in accordance with the resolution set forth in such minutes. A covenant in the assignment reads:
 
 
 35
 '1. Grantees covenant to keep or cause to be kept in full force and effect the subject oil and gas leases, and to perform or cause to be performed each and all of the covenants, terms and conditions imposed upon the original lessees or assigns, and expressly contained in such leases or expressly contained in any assignment under or through which such leases or an undivided interest therein is now held, in case any such covenant or condition in any such assignment in any wise affects the validity or continuance in force of said leases or of the interest herein conveyed to grantees, and to perform or cause to be performed all implied covenants or obligations imposed or connected with the subject leases, upon the lessee, or assigns, and to continuously operate or cause to be operated in a good and workmanlike manner in accordance with best field practices, each and all of the wells which have heretofore been drilled, or which may hereafter be drilled on the tract of land hereinabove described.'
 
 
 36
 From Cornell and Harper and from the sale of the $1,000,000 production payment agreement the Stephens Company received $1,360,000, which was paid over to the Royalty Company. In addition, the Royalty Company realized from refunds of surplus moneys in the Federal Court and from other assets of the Stephens Company sufficient moneys with the $1,360,000 to pay its indebtedness of $1,600,000 to Cornell and Harper and leave it a balance of $25,000. As the result of the transaction, of the $1,600,000 advanced by Cornell and Harper, they received back in substance $1,240,000 and the Stephens Properties, transferred to them subject to a $1,000,000 production payment, and they also incurred expenses in connection with the transactions of approximately $40,000.
 
 
 37
 The partnership, acting through Wallower as its duly authorized agent, appeared in the bankruptcy proceedings and filed its claim, mentioned above. Wallower kept up with the progress of the bankruptcy proceedings. He had knowledge that during the period of bankruptcy, up to January 25, 1955, efforts were being made to sell the assets of the Stephens Company in order to raise funds to discharge its indebtedness. Wallower also was advised before the claim was paid, which was on or before January 28, 1955, that funds had been made available to pay the claims of the Stephens Company. Notwithstanding those facts, the partnership and Wallower, its agent, continued to withhold the development contract from record, failed to file any claim with respect to that contract in the bankruptcy proceedings, and failed to notify either Cornell or Harper of the existence of the development contract prior to February 10, 1955.
 
 
 38
 Wallower testified that the reason he did not file a claim in the bankruptcy proceedings with respect to the development contract was that 'it was our impression that that contract was fully in effect and it wasn't necessary to make any claim.'
 
 
 39
 About 10 days after January 25, 1955, and prior to February 16, 1955, Moore, at the request of Waldo Stephens, went to the latter's office. Stephens then stated to Moore that he had a conversation with Dick Garrison, 'that Dick had made the statement that Harper and Cornell might have bought the property but that they were going to take them away from them, or a portion of it * * * because of an old contract.' Stephens then furnished Moore with a photostatic copy of the development contract. Moore turned the photostatic copy of the contract over to one of Harper's lawyers. Garrison was Vice-President of Ray Stephens, Inc., party of the first part in the development contract.
 
 
 40
 The original copy of the development contract had been taken from the Stephens Company files and had not been returned. Neither the photostatic copy nor any reference to the development contract was in the files made available to Moore and Harper's lawyers. Waldo Stephens stated to Moore that in his best judgment the contract had been fully performed and was terminated; that no demands had ever been made upon them for further performance and for all practical purposes it was a completed deal and for that reason the photostatic copy and the original contract, until the latter was taken from the office, had been kept in a dead file.
 
 
 41
 Prior to the conversation above referred to between Waldo Stephens and Moore, neither Cornell nor Harper nor any one representing them, had any knowledge of the development contract or of any facts which would put them on inquiry with respect thereto. The Royalty Company had no actual knowledge of the development contract prior to February 16, 1955.
 
 
 42
 Wallower testified that he had a conversation with Harper on February 10, 1955, in the course of which he asked Harper if he knew of the development contract; that Harper replied that he was familiar with the terms of the development contract; that it was his intention to fully develop the property, including the drilling of a deep test. That was the only time that either the partnership or Wallower in anywise undertook to advise Cornell or Harper of the existence of the contrace.
 
 
 43
 Within a few weeks after acquisition of the leases Cornell and Harper commenced a drilling program. They completed their first well on the leases in April, 1955. By September, 1955, they had drilled six more wells. There seven wells served to protect the leases from drainage by offset wells. Wallower admitted in his testimony that the drilling of one well a month, or 12 a year, or seven wells in seven months constituted a fair drilling program. Curtis Turney, an expert witness for the partnership, testified that the seven wells were drilled on locations which he regarded as favorable as any location on the leases; and, in effect, he refused to say that Cornell and Harper had not developed the leases as a diligent and prudent operator would.
 
 
 44
 After the completion of the seventh well and on September 13, 1955, counsel for the partnership and the Alliance Oil and Gas Company, successor to Ray Stephens, Inc., caused a letter to be delivered to Cornell and Harper in which they asserted that there had been 'a clear failure to develop' the leases involved in the instant case' in accordance with the contractual rights of our clients. We accordingly demand that immediate reassignment be made to Alliance Oil & Gas Company and Gamble Brothers of all leasehold interests originally conveyed by them to Assignee, less the producing properties set forth in Schedule B attached hereto, only so far, however, as said properties cover producing horizons.'
 
 
 45
 Cornell and Harper did not respond to the demand and thereafter, on December 22, 1955, the instant action was instituted.
 
 
 46
 Other than their failure to respond to the demand, Cornell and Harper in nowise denied that they were obligated under the terms of the development contract prior to the institution of the instant action. However, in their answer Cornell and Harper alleged that the development contract did not obligate them, because they were bona fide purchasers of the leaseholds for value and without notice of the development contract. They further pleaded that the partnership, from August, 1949, through the time of the pendency of the reorganization proceedings, was guilty of laches and was estopped to assert any alleged breaches of the development contract during that period. They denied that since they became the owners of the leases they had 'failed, neglected and refused to diligently develop and operate each * * *' of the 'leasehold estates as provided in' the development contract 'as to producing horizons at the time' the development contract 'was entered into' and denied that they had 'failed, contrary to the purpose and intent of' the development contract 'to develop each and all of said leasehold estates * * * to the other producing horizons under said lands described in' the leases.
 
 
 47
 The findings of the trial court are set forth in its opinion.[9] The trial court found that the agreed extension of time given by the partnership to the Stephens Company 'kept the contract from being breached up to the time' the Stephens Company 'filed its petition in involuntary bankruptcy in April of 1953'; that the 'contract was unbreached and in effect at such time'; that if the bankruptcy proceedings gave the partnership the right to rescind the development contract it had waived its right of rescission by failure to act promptly and diligently on discovery of the facts and by continuing to treat the development contract as a subsisting obligation; and that since 'the drilling activity of Harper and Cornell between the time they took over these properties' and the time of the commencement of this action 'measured up to further development requirements, the contract could not be deemed breached by Harper and Cornell, if applicable to them * * *,' and that no 'drainage of consequence' from the leases had occurred.
 
 
 48
 It further found that Cornell and Harper first received notice or knowledge of the development contract 'long after they had committed themselves to purchase these properties and had irretrievably altered their position.'
 
 
 49
 16 O.S.A., Perm. Ed., 15, reads as follows:
 
 
 50
 'Except as hereinafter provided, no acknowledgement or recording shall be necessary to the validity of any deed, mortgage, or contract relating to real estate as between the parties thereto; but no deed, mortgage, contract, bond, lease, or other instrument relating to real estate other than lease for a period not exceeding one year and accompanied by actual possession, shall be valid as against third persons unless acknowledged and recorded as herein provided.'
 
 
 51
 The Supreme Court of Oklahoma has consistently held that the phrase 'third persons' referred to in the statute means 'innocent purchasers for value.'[10]
 
 
 52
 It was necessary to record the development contract in order for it to be valid against bona fide purchasers for value.[11]
 
 
 53
 A reading of the trial court's opinion does not indicate it predicated its decision squarely on the doctrine of bona fide purchaser for value without notice. Rather, it held and adjudged that Cornell and Harper were not bound by the provisions of the development contract, because notice came to them 'long after they had committed themselves to purchase these properties and had irretrievably altered their position,' indicating that the basis of the decision was acquiescence and estoppel.
 
 
 54
 Notwithstanding the apparent basis of the trial court's decision, counsel for the plaintiffs strenuously argue that Cornell and Harper were not bona fide purchasers for value within the meaning of 15, supra, and counsel for Cornell and Harper earnestly urge that they were innocent purchasers for value within the meaning of such section.
 
 
 55
 However, counsel for Cornell and Harper further urge that the judgment below should be affirmed, on the basis of acquiescence and estoppel, established by the evidence introduced by the plaintiffs.
 
 
 56
 It is a general rule that it is essential to the protection of a bona fide purchaser that the purchase be completed by the execution and delivery of the conveyance and the payment of the purchase money prior to receiving notice and that if he receives notice either before the delivery of the conveyance or the payment of the purchase price he is not a bona fide purchaser.[12]
 
 
 57
 We are cited to no case and a careful search reveals none, where the Supreme Court of Oklahoma has adopted the general rule as above stated. On the contrary, in Gungoll v. Elsberry, 177 Okl. 301, 58 P.2d 852, 853, the court said: 'Uniformly, this court has held the elements constituting a bona fide purchase to be a valuable consideration, an absence of notice, and the presence of good faith.'[13] However, in that case, an assignment of the oil and gas leases involved had been executed and delivered prior to the time of notice.
 
 
 58
 And in Fuller v. Peabody, 6 Cir., 1 F.2d 965, 967, the court, in holding that a purchaser was a bona fide purchaser for value, when it had irrevocably parted with the purchase price before notice, said:
 
 
 59
 'In this situation, and assuming that the trustee had the power to sell, we think it clear that the Fordson Company was entitled to the position of a good-faith buyer, and that the sale must stand, even though we should assume that at an earlier stage of their negotiations Fuller might have maintained a bill against the trustee and the Fordson Company to declare his interest and to prevent its transfer to a goodfaith purchaser. It is true that where a deed is deposited in escrow, to be delivered to the buyer when he pays the purchase price, the title does not pass, at least until all the conditions of delivery are performed; but where the purchaser has put the purchase price in escrow, to be paid over upon the execution of the necessary deeds, and by the terms of the escrow agreement has no power to recall that deposit, we are cited to no authority, and we do not know of any principle, which will prevent a court of equity from treating him as having an equity superior to an outstanding one then first appearing on the scene. He has fully performed his contract, and he has irrevocably parted with the purchase price. * * *'
 
 
 60
 See also: Duff v. Randall, 116 Cal. 226, 48 P. 66; Tennis Coal Co. v. Asher & Hensley, 143 Ky. 223, 136 S.W. 197, 198; Maroney v. Boyle, 141 N.Y. 462, 36 N.E. 511, 513, holding that where a contract of sale and the payment of the purchase price occurred before notice, a conveyance after notice would relate back to the date of the contract of purchase.
 
 
 61
 On January 25, 1955, Cornell and Harper agreed to purchase the property and agreed that the $1,600,000 furnished by them was to be disbursed in payment of the debts of the Stephens Company. The funds were disbursed to the creditors on or before January 28, 1955, and were thus placed beyond recall. At that time Cornell and Harper had no knowledge of the development contract or of facts that would have put them on inquiry and did not acquire such knowledge earlier than February 3, 1955. Had Cornell and Harper thereafter undertaken to recover from the Royalty Company the $1,600,000 advanced through it to pay the debts of the Stephens Company, the Royalty Company could have demanded performance by Cornell and Harper of the contract of January 8, 1955, since Cornell and Harper had executed that contract, exercised their option,[14] agreed to accept the property and consented that the funds so advanced would be disbursed in payment of the claims of the creditors. It follows that there was no course open to Cornell and Harper other than to consummate the contract of January 8, 1955. That being true, before they received any notice they had irretrievably parted in substance with the purchase price of the property, although in form a part of the purchase price may have been paid by them after receipt of the notice.
 
 
 62
 However, we prefer to base our decision on acquiescence and estoppel. Here, the partnership executed and delivered assignments to the Stephens Company, which purported to transfer to that company the working interests in the leases, subject only to the overriding royalty reserved to the partnership and minor exceptions not here material. The assignments made no reference to the development contract and provided that they should continue in force so long as the oil and gas leases or any extension or renewal thereof should remain in force and effect. The partnership expressly agreed to withhold the development contract from record, and, in fact, never did record it. It is a fair inference that the development contract was withheld from record in order to permit the Stephens Company to deal with third parties, with respect to the leases, as if they were unencumbered by the development contract. The partnership permitted the Stephens Company to record the assignments of the leases to it; to take over and continue in actual possession of the leases; to drill wells on the leases; to produce oil therefrom; to market the oil; to receive the proceeds from the sale of the working interests' share of the oil, except to the extent of the partnership's overriding royalty, and to otherwise exercise full dominion over the leases.
 
 
 63
 Moreover, the partnership knew, throughout the reorganization proceedings, up to January 25, 1955, when Cornell and Harper agreed to accept the property, that efforts were being made to sell the properties of the Stephens Company to raise funds with which to pay its creditors. And, they were advised when such funds had been raised and received payment of their independent partnership claim in full.
 
 
 64
 Of course, the partnership could not have been expected to give personal notice to every prospective purchaser, but it could, and we think it should, have recorded the development contract.[15] Had it done so, there could be no doubt that Cornell and Harper or any other prospective purchaser, in a transaction of the magnitude of the sale to Cornell and Harper, would have caused an examination of the county records or of an abstract of such records, up to the date of their prospective purchase, to be made and would have discovered the existence of the development contract before irretrievably parting with the purchase money. Notwithstanding the foregoing facts, the partnership continued to withhold the development contract from record, wholly failed to give notice to the trustee, or to prospective purchasers by recordation or otherwise, of the existence of the development contract and accepted and received the benefits of the funds advanced by Cornell and Harper to the extent of $100,000 in payment of an independent partnership claim.
 
 
 65
 Mr. Pomeroy, in the Fourth Edition of Pomeroy's Equity Jurisprudence, Volume 2, at 818, says:
 
 
 66
 'Acquiescence as an Estoppel to Rights of Property or of Contract. Acquiescence consisting of mere silence may also operate as a true estoppel in equity to preclude a party from asserting legal title and rights of property, real or personal, or rights of contract. The requisites of such estoppel have been described. A fraudulent intention to deceive or mislead is not essential. All instances of this class, in equity, rest upon the principle: If one maintain silence when inconscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent. A most important application includes all cases where an owner of property, A, stands by and knowingly permits another person, B, to deal with the property as though it were his, or as though he were rightfully dealing with it, without interposing any objection, * * *'
 
 
 67
 The text of 818, supra, is quoted in full with approval by the Supreme Court of Oklahoma in Brusha v. Board of Education of Oklahoma City, 41 Okl. 595, 139 P. 298, 300, L.R.A.1916C, 233.[16]
 
 
 68
 The phrase 'stands by' does not import an actual presence, but implies knowledge under such circumstances as to make it one's duty to speak. Gatling v. Rodman, 6 Ind. 289, 292. Or, as stated by Mr. Pomeroy, 'If one maintain silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent.'
 
 
 69
 We are of the opinion that under existing facts and circumstances, there was a duty on the part of the partnership to speak, at least to the extent of recording the development contract.
 
 
 70
 Another rule equally well settled is that where the true owner of property allows another to appear as the owner of or as having full power of disposition over the property and innocent third persons are thus led into dealing with such apparent owner or person having such apparent power of disposition, they will be protected, regardless of whether the true owner has been negligent in trusting the property to the wrongdoer.
 
 
 71
 In Noe v. Smith, 67 Okl. 211, 169 P. 1108, 1110, L.R.A.1918C, 435, the court quoted with approval from McNeil v. Tenth National Bank, 46 N.Y. 325, as follows:
 
 
 72
 "Where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over, the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing as against them, the existence of the title or power, which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance."[17]
 
 
 73
 Mr. Bigelow in his work on Estoppel, Sixth Edition, p. 607, said:
 
 
 74
 '* * * it is now a well-established principle that where the true owner of property, for however short a time, holds out another, or, with knowledge of his own right, allows another to appear, as the owner of or as having full power of disposition over the property, the same being in the latter's actual possession, and innocent third parties are thus led into dealing with such apparent owner, they will be protected.'
 
 
 75
 The principle above stated was approved in First Nat. Bank of Holdenville v. Kissare, 22 Okl. 545, 98 P. 433, 434, citing Bigelow on Estoppel, Fifth Edition, p. 560.
 
 
 76
 In Metzger v. Mueller, 205 Okl. 490, 238 P.2d 802, 803, the first syllabus by the court reads as follows:
 
 
 77
 'One who purchases real estate without notice, actual or constructive of an outstanding unrecorded conveyance thereof to another party, is entitled to rely on the records and if there is nothing on the records to put him on notice, and the existence of facts and circumstances which would cause an ordinarily prudent man to make additional inquiry is not shown, he is a bona fide purchaser, and is protected against such outstanding conveyance.'
 
 
 78
 To the same effect see, also, Davis v. Lewis, 187 Okl. 91, 100 P.2d 994, syl. 3, and Barker v. British American Oil Producing Co., 208 Okl. 426, 256 P.2d 807, syl. 1.
 
 
 79
 We are of the opinion that the facts and circumstances stated above constituted a holding out by the partnership that the Stephens Company was the unencumbered owner of the leases and estopped it from asserting that Cornell and Harper took the leases subject to the development contract.
 
 
 80
 We conclude that the partnership was precluded by acquiescence and estoppel to enforce the development contract, as against Cornell and Harper. This does not leave the plaintiffs remediless against any failure in the future on the part of Cornell and Harper to protect the leases against drainage or to diligently continue the development of the leases. The provisions of Covenant No. 1 in the assignment to Cornell and Harper, quoted above, inure to them.
 
 
 81
 Affirmed.
 
 
 
 [1]
 Hereinafter referred to collectively as the plaintiffs
 
 
 [2]
 Hereinafter called Cornell
 
 
 [3]
 Hereinafter called the partnership
 
 
 [4]
 The six leases first named above are involved in the instant case
 
 
 [5]
 Hereinafter called the development contract
 
 
 [6]
 Hereinafter called the Stephens Company
 
 
 [7]
 While the record is not clear as to the terms of such order, it is fairly inferable that the court directed that effective steps be taken before December 13, 1954, otherwise the court would proceed to dispose of the matter under the provisions of 11 U.S.C.A. 636
 
 
 [8]
 Hereinafter called the Royalty Company
 
 
 [9]
 See Gamble v. Cornell Oil Co., D.C.W.D.Okl., 154 F.Supp. 581
 
 
 [10]
 See Whitehead v. Garrett, 199 Okl. 278, 185 P.2d 686, 688; Oklahoma State Bank of Wapanucka v. Burnett, 65 Okl. 74, 162 P. 1124, 4 A.L.R. 430
 
 
 [11]
 Davis v. Lewis, 187 Okl. 91, 100 P.2d 994, 996
 
 
 [12]
 92 C.J.S. Vendor and Purchaser 352, p. 291
 
 
 [13]
 See also, to the same effect: National Bond & Investment Co. v. Central National Bank of Enid, 142 Okl. 96, 285 P. 828; Brooks v. Tucker, 83 Okl. 255, 201 P. 643, syl. 3; Atkinson v. King, 93 Okl. 37, 219 P. 914, syl. 4; Exchange Bank of Perry v. Nichols, 196 Okl. 283, 164 P.2d 867, 876
 
 
 [14]
 While the record does not show such acceptance was in writing, the option was signed by both parties and oral acceptance would have been valid. Alexander v. Greenfield, 94 Ohio App. 471, 109 N.E.2d 549, 552; Detwiler v. Capone, 357 Pa. 495, 55 A.2d 380, 384; San Antonio Joint Stock Land Bank v. Malcher, Tex.Civ.App., 164 S.W.2d 197; Kottler v. Martin, 241 N.C. 369, 85 S.E.2d 314, 317
 
 
 [15]
 See Rolette County Bank of St. John v. Hanlyn, 48 N.D. 72, 183 N.W. 260, 261-262
 
 
 [16]
 See also: Heckman v. Davis, 56 Okl. 483, 155 P. 1170, 1170
 
 
 [17]
 See also: Whitt v. Kentucky Oil Producing Co., 223 Ky. 348, 3 S.W.2d 786, 787